# EXHIBIT A

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8
2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## General Civil and Domestic Relations Case Filing Information Form

☒ **Superior** or ☐ **State Court of** GWINNETT _____ **County**

| **For Clerk Use Only** | |
|---|---|
| **Date Filed** _____ | **Case Number** _25-A-01576-8_ |
| **MM-DD-YYYY** | |

**Plaintiff(s)**
SEE ADDENDUM

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Defendant(s)**
SEE ADDENDUM

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |
| Last | First | Middle I. | Suffix | Prefix |

**Plaintiff's Attorney** Pranav Lokin          **Bar Number** 184838          **Self-Represented** ☐

### Check One Case Type in One Box

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☒ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Dissolution/Divorce/Separate Maintenance
- ☐ Family Violence Petition
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

**Post-Judgment – Check One Case Type**
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Modification
- ☐ Other/Administrative

☐ Check if the action is related to another action(s) pending or previously pending in this court involving some or all of the same parties, subject matter, or factual issues. If so, provide a case number for each.

_____          _____
**Case Number**                              **Case Number**

☐ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in O.C.G.A. § 9-11-7.1.

☐ Is an interpreter needed in this case? If so, provide the language(s) required. _____
**Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.
_____
_____

Version 1.1.18

# PARTY ADDENDUM

NOMI HEALTH, INC., a corporation,

     Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED, a corporation;
OPTUM, INC., a corporation;
and OPTUMINSIGHT, INC., a corporation,

     Defendants.

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8

2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

# IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

SEE ADDENDUM
_____
**Plaintiff**

v.

SEE ADDENDUM
_____
**Defendant**

Civil Action No. _____
25-A-01576-8

## **SUMMONS**

TO THE ABOVE NAMED DEFENDANT:

      You are hereby required to file with the Clerk of said Court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

Pranav Lokin 1200 Abernathy Road NE Building 600, Suite 1500 Atlanta, GA 30328
pranavlokin@quinnemanuel.com
_____

_____

_____

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

      If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

      This _21st_ day of _February_, 20 _25_.

Tiana P. Garner
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev'd 1/25

# PARTY ADDENDUM

NOMI HEALTH, INC., a corporation,

      Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability
company;
UNITEDHEALTH GROUP INCORPORATED, a corporation;
OPTUM, INC., a corporation;
and OPTUMINSIGHT, INC., a corporation,

      Defendants.

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8
2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## General Civil and Domestic Relations Case Filing Information Form

☒ Superior or ☐ State Court of  Gwinnett Superior Court  County

| For Clerk Use Only | |
|---|---|
| **Date Filed** _____ | **Case Number** _____ |
| MM-DD-YYYY | |

Case Number: 25-A-01576-8

**Plaintiff(s)**
NOMI HEALTH, INC.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Defendant(s)**
CHANGE HEALTHCARE SOLUTIONS, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
UNITEDHEALTH GROUP INCORPORATED

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|
OPTUM, INC.

| Last | First | Middle I. | Suffix | Prefix |
|---|---|---|---|---|

**Plaintiff's Attorney**  Robin McGrath  **State Bar Number** _____  **Self-Represented** ☐

**Check one case type and one sub-type in the same box (if a sub-type applies):**

**General Civil Cases**
- ☐ Automobile Tort
- ☐ Civil Appeal
- ☐ Contempt/Modification/Other Post-Judgment
- ☐ Contract
- ☐ Garnishment
- ☐ General Tort
- ☐ Habeas Corpus
- ☐ Injunction/Mandamus/Other Writ
- ☐ Landlord/Tenant
- ☐ Medical Malpractice Tort
- ☐ Product Liability Tort
- ☐ Real Property
- ☐ Restraining Petition
- ☒ Other General Civil

**Domestic Relations Cases**
- ☐ Adoption
- ☐ Contempt
  - ☐ Non-payment of child support, medical support, or alimony
- ☐ Dissolution/Divorce/Separate Maintenance/Alimony
- ☐ Family Violence Petition
- ☐ Modification
  - ☐ Custody/Parenting Time/Visitation
- ☐ Paternity/Legitimation
- ☐ Support – IV-D
- ☐ Support – Private (non-IV-D)
- ☐ Other Domestic Relations

☐ Check if the action is related to another action pending or previously pending in this court involving some or all of the same: parties, subject matter, or factual issues. If so, provide a case number for each.

_____          _____
**Case Number**                    **Case Number**

☐ I hereby certify that the documents in this filing, including attachments and exhibits, satisfy the requirements for redaction of personal or confidential information in OCGA § 9-11-7.1.

☐ Is a foreign language or sign-language interpreter needed in this case? If so, provide the language(s) required.

_____ **Language(s) Required**

☐ Do you or your client need any disability accommodations? If so, please describe the accommodation request.

Version 1.1.20

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

NOMI HEALTH, INC., a corporation,

     Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC,
a limited-liability company; CHANGE
HEALTHCARE TECHNOLOGY ENABLED
SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED,
a corporation; OPTUM, INC., a corporation; and
OPTUMINSIGHT, INC., a corporation,

     Defendants.

Case No.   25-A-01576-8

**Jury Trial Demanded**

## COMPLAINT

Plaintiff Nomi Health, Inc. ("Nomi") states as follows for its Complaint against

Defendants Change Healthcare Solutions, LLC and Change Healthcare Technology Enabled

Services, LLC (together, "CHC"), UnitedHealth Group Incorporated ("UHG"), Optum, Inc., and

OptumInsight, Inc., (together, "Optum") (collectively, "Defendants").

## INTRODUCTION

1.     Nomi is a healthcare entity that provides direct patient care.  After growing

rapidly during the COVID-19 pandemic, Nomi engaged CHC to manage its claims processing

and ensure proper reimbursement for its services.  Since UHG-subsidiary Optum acquired CHC

in 2022, Optum and UHG have controlled, operated, and acted for and on behalf of CHC with

respect to the matters at issue herein.

2.     Nomi has paid CHC over $35 million to date, yet CHC has failed to live up to its

representations, consistently failing to perform its basic duties under the parties' agreement, such

as accurately processing claims and following up on denied claims.  In addition, CHC repeatedly

lied and misled Nomi to hide its failures, referring Nomi to Optum and UHG and claiming they

were responsible for resolving Nomi's claims processing issues.

3.      To add insult to injury, in the midst of these failures, Defendants failed to comply

with their duty to employ proper data security measures to protect Nomi confidential

information, resulting in a cataclysmic data breach and the complete loss of Nomi's sensitive

commercial health data.

4.      Defendants <u>failed to provide Nomi with proper notice</u> of the data breach.  Instead,

Defendants misled Nomi, claiming their systems and servers were momentarily down for

"updates," due to a cybersecurity event, when in fact they had suffered a system wide ransom

attack resulting in the loss of Nomi's and other customers sensitive data.

5.      Defendants have violated their statutory, fiduciary, and contractual obligations to

Nomi and others through reckless or intentional misconduct.  Nomi brings this action to

vindicate its rights under Georgia law.

## PARTIES, JURISDICTION AND VENUE

6.      Plaintiff Nomi Health, Inc. is a Delaware corporation with its principal place of

business in Utah.

7.      Defendant Change Healthcare Solutions, LLC is a Delaware LLC with its

principal place of business in Nashville.

8.      Defendant Change Healthcare Technology Enabled Services, LLC is a Georgia

LLC with its principal place of business in Minnesota.

9.      Defendant UnitedHealth Group is a Delaware corporation with its principal place

of business in Minnetonka, Minnesota.  UHG exercises control over CHC's cybersecurity and IT

systems, including the systems impacted by the events described herein that housed the personal, medical, and financial information, including electronic protected health data of Georgia residents and entities.

10.    Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum regularly transacts business in Georgia through its operation of CHC, and transmits personal, medical, and financial information, including electronic protected health data through its operation of the CHC.

11.    Defendant OptumInsight, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum regularly transacts business in Georgia through its operation of CHC, and transmits personal, medical, and financial information, including electronic protected health data through its operation of the CHC.

12.    This Court has personal jurisdiction over Defendants because they are registered to do business in Georgia with registered agents in the State.  Additionally, Change Healthcare Technology Enabled Services, LLC is a Georgia entity controlled by Defendants.  Defendants also executed contracts with Nomi that include a choice of law provision for the State of Georgia.  Personal jurisdiction is also proper because each Defendant regularly transacts business in the state and contracts to supply services in the state.  In addition, upon information and belief, many of Defendants' computers, networks, and data located in the State of Georgia were the subject of the unpermitted behavior at issue in this Complaint.

13.    Venue is proper in this Court pursuant to O.C.G.A. § 9-10-30 and other applicable law, as certain contracts at issue were—upon information and belief—executed in Gwinnett County, Georgia, and Defendants conduct business within Gwinnett County, Georgia.

Additionally, many of the acts and omissions giving rise to Plaintiff's claims occurred within Gwinnett County, Georgia.

14.     This is an action for damages in excess of Fifteen Thousand Dollars ($15,000) exclusive of attorneys' fees and costs.

## FACTUAL ALLEGATIONS

**A.    Background**

*Nomi's Founding and Growth During the COVID-19 Pandemic*

15.     Nomi is a direct-to-patient healthcare company founded in 2019.  The company's lineal contracting model streamlines healthcare services by eliminating middlemen to reduce costs.

16.     Nomi grew quickly during the COVID-19 pandemic as a premiere provider of testing and vaccinations.  It worked closely with governments, businesses, and other healthcare providers to deploy mobile testing sites and facilitate access to vaccinations, including to prisons, long-term care facilities, border sites, shelters, and government housing facilities.

*CHC Agrees to Timely and Diligently Perform Revenue Cycle Management Services*

17.     As Nomi rapidly grew, it recognized the need for a revenue cycle management ("RCM") services industry leader as a partner to help it grow and develop.  RCM service refers to the financial aspects of patient care—including the processing of insurance claims, which was (and remains) vital to Nomi's business.

18.     Nomi began searching for and vetting RCM services providers. During this competitive search process, Nomi requested proposals from leading industry RCM services providers, including CHC.

19.     Nomi informed CHC at the outset of the parties' relationship that the volume of claims would be intensive due to Nomi's rapid growth and the extensive services it provided.  In its proposals to be Nomi's provider, CHC represented itself as "best in class" for RCM services, and indicated that it could adequately meet Nomi's growing needs.  It also claimed to be a "full RCM vendor."  In a proposal dated December 2, 2020, CHC also represented to Nomi that CHC would provide comprehensive laboratory billing services, monthly reporting, line-item payment posting, and claims follow-up with third-party payors.

20.     In reliance on CHC's representations, Nomi entered into a business relationship with Defendants in December 2020.  Due to the sensitive nature of Nomi's customer data, Nomi relied heavily on CHC's asserted expertise.

21.     Nomi signed a Master Relationship Agreement ("**MRA**") with CHC on December 1, 2020.  This agreement (and its subsequent amendments) set forth the parties' working relationship, with a foundation of CHC's minimum obligations to provide RCM services for Nomi.

22.     In addition to the MRA, CHC and Nomi executed a series of supplemental agreements. These include: a Solution Order to the MRA, dated December 1, 2020; a Second Solution Order to the MRA, dated January 8, 2021; a First Amendment to the MRA and Solution Order, dated March 24, 2022; and a Second Amendment to the Solution Order, dated May 16, 2022 (collectively, the "**Contracts**").

23.     At the time Nomi and CHC entered into this business relationship, the parties mutually understood that CHC would not simply be augmenting the capabilities or staff of Nomi's RCM function.  Rather, CHC agreed to serve as the fully-outsourced RCM services provider for Nomi.

24.     It was not until more than four years later that Nomi learned, by Defendants' admissions during a January 9, 2025 meeting, that CHC was *not* a full-service RCM vendor but was instead a "middle" RCM vendor, meaning that it was not and never had been equipped to process Nomi's claims as it had previously represented.

25.     Under the Contracts, CHC agreed to "prepare and submit claims" and "follow up on denials and unpaid insurance" as part of its RCM services.  Second Solution Order to the MRA, Statement of Work ¶1.1.1(a), (g).

26.     CHC agreed to "enter demographic information and coding information into the Billing System" in a "timely and diligent matter"; "submit the appropriate claims to the appropriate third party payors"; and "make commercially reasonable efforts to resolve billing issues."  *Id.*, Statement of Work ¶¶ 1.1; 1.1.1(a); Appendix C ¶¶ 2(d), (f).

27.     CHC also agreed to provide Nomi with billing information and records, including "the date of the original billing, the date of remit and amounts remitted by the applicable payor, and any other associated detail such as reasons for rejection or reason [a] claim was not submitted."  *Id.*, Appendix C ¶ 2(e).

28.     To facilitate provision of these services, Nomi entrusted Defendants with extensive confidential information, including its patients' highly sensitive personal information. In this sense, Defendants functioned as the custodians of *all* Nomi's claims data.

***Defendants Process and Store Sensitive Personal Information***

29.     Defendants act together as a digital clearinghouse for the healthcare industry, providing revenue and payment cycle management services that connect patients, providers, pharmacies, and payors within the healthcare pipeline.  The information Defendants receive, process, and store for Nomi is subject to the requirements of the Health Insurance Portability and

Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health

Information Technology for Economic and Clinical Health Act Pub. L. No. 111-5, 123 Stat. 226

("HIPAA"). These laws generally require the implementation of security procedures and

practices that "[e]nsure the confidentiality, integrity, and availability of all electronic protected

health information the covered entity or business associate creates, receives, maintains, or

transmits." HIPAA, 45 CFR § 164.306(a).

30.     As one of the largest processors of sensitive health information in the nation,

CHC, its parent entity UHG, and its operating entity Optum recognized and acknowledged the

importance of proper data handling and up-to-date security systems.

31.     In the course of its business, Defendants receive, process, and store electronic

protected health information of tens of millions of Americans.

32.     Defendants represented that they had numerous security policies in place that

should have prevented the harms at issue here, purportedly including Multi-Factor

Authentication, information control and backup infrastructure for all network zones, and a

recovery testing process.

**B.      Defendants Breach Their Contractual, Fiduciary, and Statutory Obligations**

33.     Despite its contractual and statutory obligations, CHC repeatedly failed to

perform even the most basic functions, including by failing to: (1) submit claims to the proper

payors; (2) enter the proper coding information; (3) follow-up on denials and under-

reimbursements; and (4) provide accurate records to Nomi.

34.     Furthermore, CHC falsely represented on *multiple* occasions that these errors had

been resolved.

35.     These misrepresentations and failures were uncovered by Nomi through its own costly and time-consuming independent efforts to obtain payment for claims that CHC failed to process properly.

***CHC's Failures and Misrepresentations to Process Claims***

36.     In the aggregate, CHC has failed to correctly process over 3.6 million claims.  In some instances, CHC failed to prepare and submit claims altogether, even though it represented to Nomi that such claims had been processed.

37.     For example, on February 1, 2022, a CHC data analyst represented to Nomi via email that all claims in an attached spreadsheet (representing $19 million in payments owed to Nomi) had been properly submitted to the payor for payment.

38.     Nomi relied on that representation and made strategic business decisions under the assumption that those claims had been submitted, and that it would be paid for those claims.

39.     However, in an email dated February 10, 2025, CHC's data analyst for Nomi's account admitted that this statement was false and misleading because CHC had improperly submitted and never subsequently corrected nor resubmitted *tens of thousands* of these claims.

40.     Nomi learned—during a January 9, 2025 meeting with Defendants' representatives—that CHC has not worked *any* of Nomi's claims since roughly February of 2024.  This revelation came as a shock to Nomi, given that CHC had represented to Nomi as recently as November 2024 that it was actively processing Nomi's claims.  In an email dated November 14, 2024, a CHC account manager—employed by Optum—provided to Nomi a chart identifying the pending claims in Nomi's 30, 60, and 210-day accounts receivables, and represented that CHC/Optum was still actively working on those claims.  This representation was

false, as CHC/Optum had not worked Nomi's claims for at least nine months at the time of its November 2024 representation.

41.    Where CHC *has* submitted claims, those claims have been rife with errors.  For example:

    a.    Numerous claims were sent to the wrong payor, *i.e.*, claims which should have been sent to payors like Multiplan, Zelus, or HRG were instead erroneously sent to FirstHealth—which is not a payor at all—for payment.  This error was repeated across ***hundreds of thousands of claims*** sent to dozens of incorrect payors.

    b.    CHC posted direct patient payments for claims which, as a matter of law, Nomi was not permitted to accept payment.  CHC's errors resulted in Nomi having to return thousands of dollars of payments to patients after Nomi independently discovered the issue via news stories disparaging Nomi for CHC's error.

    c.    CHC improperly coded claims, often so egregiously that payors refused to accept claims from Nomi at all.  For instance, a Hawaii-based payor notified Nomi that—because the claims it was receiving from CHC on Nomi's behalf were so severely miscoded it could not even discern what the claims were for—the payor would not accept *any* further claims from Nomi until it could provide *thirty* examples of correctly coded claims.

    d.    CHC committed a coding error that resulted in all codes which should have contained the sequence "000" or "555" converting to contain the sequence "NNN."

e.  CHC failed and in some cases outright refused to follow up on more than half a million previously denied claims, making no credible efforts to pursue these denials or engage with the payors to determine the basis for the rejections.

f.  In cases where CHC *did* appeal denied claims, the appeal letters were grossly deficient, containing factually incorrect or irrelevant data, omitting the proper billing codes for payors to identify the subject of the appeal, and failing to identify the letter's purpose.

***CHC's Failures and Misrepresentations in Connection with HRSA UIP***

42.  During the COVID-19 pandemic, the Health Resources and Services Administration established the Uninsured Program ("HRSA UIP") to process and distribute reimbursement to healthcare providers who provided testing, treatment, and vaccine administration to uninsured patients.

43.  CHC also contracted to process Nomi's HRSA UIP claims, but failed to do so.

44.  For example, CHC failed to properly code claims for COVID-19 testing.  Coding these claims is simple, but requires two entries: one for specimen collection, which is billed at $40, and one for lab testing, which is billed at $140.

45.  However, when billing the HRSA UIP for these claims, CHC failed to include the lab code.  This omission resulted in a $140 error ***on each and every HRSA UIP testing claim***.

46.  Repeated over the course of Nomi's 151,808 HRSA UIP claims, this resulted in a loss of over $20 million that should have been paid by HRSA UIP to Nomi.

47.  CHC also failed to properly code claims for COVID-19 vaccinations.  Like COVID-19 testing claims, these claims require two codes: one for the vaccine (which cannot be

billed for payment), and one for the vaccine administration, which entitles the claimant to payment.

48.    The standard industry practice is to bill the vaccine at one cent (which was disregarded by the payer) and bill the administration of the vaccine at the HRSA approved rate of $40.

49.    Instead, CHC improperly billed roughly ***75,000 vaccine administrations at one cent***, omitting the administration code necessary for Nomi to receive payment.  This failure alone resulted in millions of dollars of lost revenue for Nomi.

50.    These failures were exacerbated by CHC's failure to maintain its promised pace with Nomi's patient care.  CHC consistently failed to timely process Nomi's daily HRSA file submissions and accumulated a backlog of several hundred thousand unprocessed HRSA UIP claims.

51.    Nomi repeatedly raised this issue to CHC.  Rather than fix the problem, however, CHC misrepresented the facts to Nomi—assuring Nomi that it had put systems in place to remedy the issue, when in reality it had not.

52.    In a recent January 9, 2025 meeting, Michael Summers from CHC and Optum finally came clean: CHC had *not* fixed the backlog; rather, they "thought they sent them all," but "files were stored in several locations because of new shells" or "HRSA claims were saved online."  In other words, almost three years after the HRSA program closed, CHC and Optum finally admitted that they had never remedied the backlog issue, resulting in thousands of unsubmitted HRSA claims.

53.     CHC failed to resolve any of these issues by the time the HRSA UIP program closed in March 2022.  Nomi was subsequently unable to independently pursue payment for these claims because of CHC's gross negligence and misrepresentations to Nomi.

***CHC's Misrepresentations and Failures Put Nomi's Medicaid Licensure in Jeopardy***

54.     CHC's numerous failures nearly cost Nomi its Medicaid licensure, creating costly complications in Florida.

55.     One RCM service CHC agreed to provide was a healthcare "lockbox"—a service that centralizes digital payments and documents.  Nomi paid CHC to regularly monitor the lockbox and notify Nomi of any information requests that had been submitted.

56.     Nomi relied on CHC to monitor the lockbox, but CHC failed to do so.  As a result, Nomi received what is commonly referred to as the "final notice to terminate," which was sent to *every* provider in the state of Florida—informing them of lockbox mismanagement.  This caused nearly all Florida payors to refuse payment, each one citing the final notice to terminate as a basis for doing so.

57.     The final notice to terminate not only cost Nomi financially, it placed Nomi's Medicaid licensure in jeopardy and drastically delayed reimbursement of a net $46,744,338 in claims by Florida State Medicaid.

58.     CHC's misrepresentations related to its lockbox monitoring also caused significant cash flow issues for Nomi, including three lawsuits due to Nomi's inability to pay invoices, a $2,500 fine, an increase in capital costs, and dilution of Nomi Health.  Ultimately, Nomi had to raise approximately $10 million just to maintain operations after the final notice to terminate.

59.     When Nomi inquired about CHC's failure to maintain the lockbox, it was informed that the employee who had been assigned to monitor the lockbox—and indeed the only one given access—had not been employed by Optum **for months**.

60.     Had Defendants properly monitored the lockbox as CHC agreed to, Nomi never would have received the final notice to terminate, nor suffered damages in Florida.

***Defendants Conceal Their Errors by Failing to Provide Nomi with Records***

61.     Based on Defendants' failures, Nomi began requesting access to its own data so that it could begin the costly and time-consuming process of processing the claims itself.  In particular, Nomi sought the electronic files used to inform healthcare providers about an insurance provider's response to a claim (known as "835" and "837" forms).

62.     CHC was obligated to provide Nomi with accurate billing and payment records, including 835 and 837 forms, yet routinely failed to perform this simple task.

63.     Instead, when Nomi requested copies of the 837 forms—so that it could maintain an internal backup on its own server or seek alternate vendors to process the claims—Defendants represented that they could only provide "about 90%" of the records.  When Nomi requested copies of the 835 forms, CHC sent only about 50% of what was requested.

64.     Through its own labor-intensive efforts to reconcile claims that should have been processed by CHC, Nomi discovered that several ***million*** 835 and 837 forms remain missing.

65.     This was contrary to previous representations made by CHC—and relied upon by Nomi—which asserted that the issue had been resolved.

66.     At one point, CHC indicated that 8.6 million individual medical record numbers had "paid" or "denied" events, but CHC only provided Nomi with 4.67 million corresponding 835 forms.

67.    When confronted with this discrepancy, CHC informed Nomi that it had *intentionally* deleted some of these forms due to system or file corruption.

68.    Nomi identified an additional 59,000 instances where the 835 forms did not align with CHC's own data.  Specifically, while CHC data shows no response from the payor, the corresponding 835 forms demonstrate that the claims were denied.  Upon information and belief, CHC intentionally misrepresented which claims related to which 835 forms because they knew they had failed to properly maintain the data.

69.    These errors are a direct result of Defendants' gross failures, wanton misconduct, and fraudulent claims processing.

**C.    The Data Breach**

70.    In addition to CHC's inexcusable failures to provide routine and basic RCM services, Defendants are also directly responsible for a catastrophic data breach in February 2024 which has caused immeasurable damages to Nomi.

71.    Prior to the breach, Defendants claimed that they had numerous enterprise information security policies in place to prevent security breaches, including multi-factor authentication on all user authenticated systems, among other alleged safeguards.

72.    Defendants' public representations also illustrated that they recognized and acknowledged the importance of proper data handling and up-to-date security systems.

73.    For example, CHC included in its Code of Conduct, publicly available on its website at the time of the Security Breach, the following representations:

      a.    "We exercise care and discretion when handling [restricted and confidential] information."

b.  "We collect, store, access, use, share, transfer, and dispose of [personally identifiable information] responsibly."

c.  "We also respect and protect the sensitive nature of [protected health information] and carefully maintain its confidentiality."

d.  "We earn the trust of our team members and the companies with which we do business by following our privacy, security, and data and information protection policies."

e.  "We also regularly monitor our systems to be sure that information is accessed and used for appropriate, authorized activities, to discover any new threats, and to look for ways to improve."

f.  "We monitor and control all electronic and computing devices used … to interact with our internal networks and systems."

74.    CHC's Global Privacy Notice, publicly available on its website at the time of the Security Breach, advertised:

a.  "CHC Healthcare functions as a HIPAA business associate for its HIPAA covered entity payor and provider customers at its primary business function, so CHC Healthcare's collection, use and disclosure of protected health information is guided by HIPAA and the terms of a business associate agreement and other contracts."

b.  "We implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse."

75.     In February 2023, CHC published a "Regulatory and Standards Update" and boasted: "To demonstrate our continued commitment to assure that applicable Change Healthcare products and services meet industry and regulatory requirements and expectations, we maintain several industry-recognized and trusted accreditations and certifications." *Change Healthcare Regulatory and Standards Update*, 59 (Feb. 15, 2023), https://health.maryland.gov/pophealth/Documents/Change_Healthcare_Regulatory_and_Standards_Quarterly_Update.pdf.

76.     Defendants confirmed their data security competence on multiple occasions throughout the parties' relationship.

77.     For example, on or about June 23, 2024, CHC moved to a platform called "Move-It," which Nomi believed had certain security vulnerabilities, so Nomi asked Defendants if its data would be affected. In response, Nomi was told that "**UHG** invests significant resources to maintain CHC's data security systems." This led Nomi to believe that its data would be secure.

***Defendants Owed Contractual, Statutory, and Fiduciary Duties to Protect Nomi's Data***

78.     In addition to Defendants' general policies and representations regarding data security, CHC—in particular—was bound by express contractual obligations to protect Nomi's data.

79.     For example, Section 8.1 of the MRA provides: "Each party will protect and safeguard the other party's Confidential Information with . . . no less than reasonable care."

80.     Section 11 of the MRA, titled "Professional Services Warranty," provides that "CHC warrants that it will perform all Professional Services in a professional manner consistent with industry standards by trained and skilled resources."

81.     Section 14 of the MRA, titled "Security," obligates CHC to "implement industry standard security measures in order to secure the Products and Services, and [] promptly notify [Nomi] of any unauthorized access to the Products or Services or any unauthorized use or disclosure of any Confidential Information or Protected Health Information (a 'Security Breach')."

82.     Section 5 of Exhibit 2 to the MRA, titled "Security Measures," provides that "CHC will implement and maintain appropriate administrative, physical, and technical safeguards, including encryption, for protection of the security, confidentiality and integrity of all Transaction information, including to prevent unauthorized use or disclosure of, or access to, Transaction information by third parties, and CHC will only store and process Transaction information as required to fulfill its obligations under this MRA and/or as required by applicable laws. CHC is responsible for, and the term 'Security Breach' as used in this MRA will include, any unauthorized use or disclosure of any Transaction information."

83.     Section 4 of the Processing Services Schedule to the Solution Order to the MRA provides that CHC "warrants that the Processing Services will perform in material accordance with the functional specifications in the applicable Documentation."

84.     Section 7 of Exhibit 2 to the Solution Order to the MRA, titled "IT Security and Privacy," provides that CHC will, among other things, maintain proper certifications, maintain HIPAA compliance, rotate master client keys at least annually, encrypt all data in flight and at rest; and notify Nomi of any data breaches regarding data it shared with CHC within 72 hours of determination of a breach.

85.     On various instances when Nomi has questioned CHC about its contractual obligations, CHC has consistently referred Nomi to Optum.  CHC is a subsidiary of Optum, and

the contact information for "questions or complaints" related to CHC's Global Privacy Notice is an Optum email and an Optum mailing address. Optum, in turn, is owned by UHG.

86.    As a repository to Nomi's sensitive data, Defendants owed fiduciary duties to safeguard Nomi's private information related to sensitive healthcare data.

87.    As set forth below, Defendants failed to comply with those fiduciary obligations, in addition to the contractual provisions cited above. In particular, Defendants did not implement industry standard security measures. Nor did they properly notify Nomi of the breach.

***Hackers Access CHC's Systems and Exfiltrate Sensitive Data***

88.    Although Defendants never properly notified Nomi about facts related to the breach, Nomi has since learned details about what took place from public disclosures in other lawsuits related to the data breach.

89.    According to these disclosures, on or about February 11, 2024, the username and password for a low-level, customer support employee's access to CHC's Citrix portal (the "Portal") were posted in an Telegram group chat that advertises the sale of stolen credentials.

90.    The Portal was a virtual desktop, where the employee could access the CHC applications (as permitted by CHC) needed to perform their job responsibilities. The account was a basic, user-level account: it only had access to specific applications and did not have administrator access or credentials.

91.    On February 12, 2024, a hacker accessed the Portal via the username and password shared on the Telegram group chat, thus gaining entry to the basic, user-level account. From that limited account, the hacker was able to break into the server that hosted CHC's medication management application, SelectRX.

92.     This access to systems critical to CHC's operations—by a user-level account—went undetected by Defendants until the hacker revealed itself, after it began to encrypt CHC's systems over a week later, locking CHC out of those systems.

93.     From there, the hacker created privileged accounts with administrator capabilities that permitted access to and deletion of any and all files, changes to system configurations, and similar administrator-level activities. These actions went to the heart of the integrity of CHC's most critical IT infrastructure, but still went undetected by Defendants.

94.     Over the next nine days, the hacker navigated through CHC's systems and servers at will, installing multiple malware tools and applications, as well as a number of "backdoors" that would allow the hacker to return to those environments in the event CHC did detect the suspicious activity and try to block access.

95.     The hacker continued to access the systems undetected and unimpeded. The hacker copied and exfiltrated terabytes of personal identifying information, financial account information, and protected health information for tens of millions of individuals, including Social Security numbers, driver's licenses, state ID numbers, passport numbers, health insurance information (such as primary, secondary or other health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), health information (such as medical record numbers, providers, diagnoses, medicines, test results, images, care and treatment), and/or billing, claims and payment information (such as claim numbers, account numbers, billing codes, payment cards, financial and banking information, payments made, and balance due). These acts, too, went undetected until the hacker revealed itself.

***Nomi Finally Learns of the Attack***

96.     It was not until February 21, 2024, when the hacker deployed ransomware on CHC's systems causing outages and disruptions, that Defendants purportedly became aware of a cybersecurity threat to CHC's systems.

97.     That day, in response, Defendants took CHC's systems offline.  That is, the hacker's infiltration of CHC's systems was so severe that CHC's only response was to shut down its primary *and* secondary systems.

98.     Defendants misled Nomi about the nature of the breach.  Instead of admitting that their systems had been hacked, Defendants told Nomi that their systems were down for maintenance, but that they would be back up shortly.

99.     On or about February 23, 2024, Defendants again misled Nomi, stating that the *reason* the systems were being shut down was for "updates" that would continue through the weekend.  Defendants knew this was untrue.

100.    On or about February 26, 2024, the ransomware group BlackCat/ALPHV ("BlackCat") claimed responsibility for the attack.  CHC later confirmed that BlackCat had represented itself as responsible for the attack, and had claimed to have stolen terabytes of data.

101.    On or about March 3, 2024, UHG made a bitcoin ransom payment to BlackCat of approximately $22 million.

102.    The payment of the ransom, however, did not bring CHC's systems back online or mitigate the harm done.  Because CHC was unable to check every system and interface for backdoors, and because CHC's backup systems were also compromised, CHC was unable to repair its systems.  Instead, CHC opted to rebuild its systems from the ground up because its redundancy systems were inadequate.

103.    The data breach—and resulting harm—were avoidable had Defendants implemented proper security measures.  As of February of 2024, CHC did not have systems, policies, and practices in place appropriate to secure and protect the volume and highly sensitive nature of the data being handled, including Nomi's data.

104.    Upon information and belief, Defendants were aware that CHC maintained outdated and highly-vulnerable systems.  For instance, as UHG's CEO testified to Congress, aspects of CHC's legacy systems used to process claims and payments were *up to 40 years old*. UHG's CEO also revealed that CHC stored most of its data on physical servers, rather than cloud-based servers, which were less secure and lacked appropriate segmentation to take into account the sensitivity of the data at issue.

105.    Among the outdated features of CHC's systems was the lack of multi-factor authentication, a security feature that requires a user to provide multiple, independent pieces of evidence to authenticate their identify and gain access to a system.

106.    Once CHC's system was infiltrated, the hacker was able to disable both the primary and backup systems because the backup systems were not isolated from the primary, and few elements were stored on the cloud, both basic security features.  Moreover, CHC's redundancies were also affected, inadequate, or both.  This prevented the backup and redundancy systems from being effectively utilized to mitigate the damage from the breach.

107.    Similarly, the lack of segmented systems, which are common to cloud-based servers, allowed the hacker to travel among CHC's systems freely—compromising multiple systems which CHC was unable to recover—and ultimately resulting in the complete shutdown of CHC's operations.

108.    These failures demonstrate Defendants' breach of its obligations to "safeguard [Nomi] Confidential Information with . . . no less than reasonable care" and "implement industry standard security measures in order to secure the Products and Services."

109.    The Security Breach also caused Nomi severe reputational harm among payors and providers.  At least one provider informed Nomi that, because of the lack of data, it would not accept any more Nomi claims until it could consistently present more accurate information.

***Failure to Provide Notice***

110.    CHC was under a contractual obligation to "promptly notify [Nomi] of any unauthorized access to the Products and Services" including "any data breaches regarding data shared with [CHC] by Nomi within 72 hours of determination of a bona fide Security Breach." MRA ¶ 14; Ex. 2 ¶ 7.

111.    CHC did not promptly notify Nomi of the Security Breach; in fact, after discovering the Security Breach on February 21, 2024, Defendants ***misled*** Nomi, informing them that the systems were "down," but would be back up shortly, which was untrue.

112.    Nomi eventually learned the truth—that the systems were not, in fact, "down due to updates," but that a hack had occurred and that their data was missing and/or unrecoverable.

113.    Ultimately, the hack was catastrophic for Nomi, compounding already existing problems by causing additional delay in processing—and adding harm to providers, payors, and consumers.

114.    Nomi was unable to access important data like 835 and 837 forms, and Optum continuously represented that the servers were down.  This prevented Nomi from being able to discern what it was owed from payors, and directly impacted its ability to engage in or complete bulk settlements with providers like Advent, Brighthealth, Cigna, and Oscar.

115.    For example, in the midst of Nomi's efforts to settle claims with certain payors that had been mishandled by CHC, Nomi lost a large volume of claim numbers, which prevented further efforts to settle the claims.

116.    For the claims they *were* able to settle, Nomi was often forced to accept a lower offer due to the data breach.  By way of example, prior to the breach, one provider owed Nomi approximately $2 million, but because of the lack of data available after the breach, Nomi was forced to settle for $***35,000***.

117.    Without the available data, Nomi did not know how much it was owed, and was forced to rely on the *payor* to provide that information.

118.    Bulk negotiations with payors were also drawn out because Nomi ***didn't have access to the systems***.

119.    Another problem caused by the breach was that Nomi was required to hire <u>other vendors</u> to do work that CHC was neglecting (or refusing) to complete.  On average, Nomi spent an estimated $75,000 to $100,000 per month on these new vendors to do the same work that it was ***already paying CHC to do***.

120.    Throughout 2024 and the beginning of 2025, CHC continued to misrepresent to Nomi that the claims it had agreed to handle would be processed.  As noted above, Nomi discovered—in January of 2025—that CHC had stopped working on these claims in ***February of 2024***.  Many of the claims—such as Hawaii Medicaid claims—have since timed out and can no longer be processed.

121.    Had Nomi known that CHC was ***not*** working those claims, it could have sought to process those claims through one of its alternate vendors.

122.    Nomi has repeatedly asked Defendants to correct these errors—both in writing and orally.

123.    Beginning in February 2024, Nomi held a weekly meeting with Optum to work through these complications and seek alternative remedies to their losses.  On various occasions, Nomi asked CHC/Optum to correct certain inconsistencies or inaccuracies, but CHC/Optum never did.  Defendants never even ***attempted*** to integrate Nomi's lost data back into its system.

124.    Instead of addressing the actual issue, Optum suggested that Nomi enroll in the company's temporary funding program while the systems were "down."  Nomi was informed that their concerns should be routed through UHG's lobbyists.  Nomi contacted UHG and Optum's deputy counsel, who rebuffed Nomi's concerns.

## FIRST CAUSE OF ACTION

### (Violation of § 10-1-372 of the Unfair Trade Practices Act against All Defendants)

125.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

126.    A person engages in a deceptive trade practice under the Unfair Trade Practices Act ("UTPA") when he represents that "services are of a particular standard, quality, or grade . . . if they are of another."

127.    Corporations damaged by a deceptive trade practice may be granted an injunction or other equitable relief against the party charged with the unlawful practice in addition to attorneys' fees if the offending party "willfully engaged in the trade practice knowing it to be deceptive."

128.    Defendants engaged in multiple deceptive trade practices as detailed above by willfully misrepresenting the quality of their services and cybersecurity protocols, by claiming

that they had properly submitted claims on Nomi's behalf, and by misleading Nomi about gravity of the data breach.

129.    When Nomi raised concerns about these misrepresentations, CHC referred Nomi to both Optum and UHG employees to purportedly resolve claims processing errors and the loss of Nomi data.  Despite numerous good faith attempts by Nomi to work with Defendants, Defendants have failed to correct the processing errors and recover Nomi's lost data. Defendants' misrepresentations have resulted in millions of dollars in damages to Nomi.

130.    For example, despite touting itself as an expert in billing and coding the procedures of healthcare providers to thousands of payors, CHC failed to adhere to even the most basic aspects of Nomi's billing to the HRSA UIP—namely, the use of Modifier 90 for laboratory procedures performed by a reference lab.

131.    This is a basic feature of lab billing; yet, Nomi discovered thousands of examples in which CHC provided HCFA 1500/CMS 1500 forms showing Modifier 90 claims for two different labs.

132.    Similarly, CHC only submitted to the HRSA UIP for one charge (the lesser of the two—the specimen collection), and omitted the remainder of what should have been a much larger claim.

133.    Nomi has repeatedly raised theses failure with the Defendants who were unable to correct the coding procedures and UIP specimen charges, costing Nomi millions of dollars in lost claims.

134.    Defendants also failed to properly safeguard Nomi's confidential consumer data, allowing their systems to be breached and permitting access to hundreds of thousands of Nomi client records.  To date, Defendants have not recovered Nomi's data.

135.    For example, Defendants have not been able to produce the 835s and 837s forms—that should be in their possession—back to Nomi so that Nomi could submit its own claims after the data breach.

136.    This has not only caused delays to Nomi's business operations, but it has prevented Nomi from collecting on numerous payor claims and/or seeking another vendor to process outstanding claims, and has further opened the company up to liability for the loss of confidential consumer data.

137.    Based on these failures, Nomi is entitled to equitable relief requiring Defendants to turn over **all records** related any claims filed (or sent to CHC to be filed) on behalf of Nomi, in addition to all attorneys' fees with regard to bringing this Complaint.

138.    Relief under the UTPA is not limited to equitable relief; additional remedies are available "under the common law or other statutes of the state" as identified below.

## SECOND CAUSE OF ACTION

### (Violation of § 10-1-393 of the Fair Business Practices Act of 1975 against All Defendants)

139.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

140.    The purpose of the Fair Business Practices Act ("FBPA") is to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of trade or commerce.

141.    Under the FBPA, it is unlawful to "represent[] that goods or services have . . . characteristics [] uses, [or] benefits . . . that they do not have" or "represent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another." FBPA § 10-1-393(a); (b)(5); (b)(7). The FBPA protects both businesses as consumers and individuals as consumers. *See Inkaholiks Luxury Tattoos Georgia, LLC v Parton*, 751 S.E.2d 561, 563 (Ga.

26

Ct. App. 2013) ("The FBPA protects businesses from unfair or deceptive practices in the conduct of trade or commerce . . . and provides for damages and injunctive relief.")

142.    It is also unlawful under the FBPA for "any person . . . who is engaged in any activity involving or using a computer or computer network . . . [to] [e]mploy any device, scheme, or artifice, to defraud a person, organization, or entity" or "[e]ngage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon a person, organization or entity."  FBPA § 10-1-393.5(b).

143.    Any person (or corporation) who suffers an injury or damages as a result of a violation of the FBPA has a remedy against the offending party pursuant to Ga. Code Ann. § 10-1-399.

144.    Defendants engaged in multiple deceptive trade practices as detailed above by willfully misrepresenting the quality of their services and cybersecurity protocols, by holding themselves out as a comprehensive RCM provider, by claiming that they had properly submitted claims on Nomi's behalf, and by misleading Nomi about gravity of the data breach.

145.    Nomi has sent multiple written notices advising Defendants of their material failures and contractual breaches.  On March 1, 2023, Nomi gave CHC notice of its failure to properly process claims. Nomi re-iterated these same concerns by letter on November 6, 2023. As noted above, in response to these and other good faith attempts to resolve issues, CHC consistently referred Nomi to Optum and UHG representatives.

146.    Most recently, on April 24, 2024, after numerous emails and meetings with Defendants' representatives attempting to recover Nomi's data after the data breach, Nomi sent a letter to Defendants' counsel, identifying the claims processing failures, inconsistent and missing data, and the losses Nomi had suffered.

147.    To date, Defendants have not recovered Nomi data, corrected the missing and inconsistent claims processing, or paid Nomi for the losses it has suffered due to their misrepresentations and deceptive business practices.

148.    Nomi has been damaged by an amount to be determined at trial.

## THIRD CAUSE OF ACTION

### (Breach of Contract against CHC)

149.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

150.    As explained above, Nomi and CHC executed several business agreements between 2020 and 2022, known collectively as the Contracts.

151.    Nomi has complied with all material terms of the Contracts.

152.    CHC repeatedly failed to perform under the Contracts, including billing the proper payor, appealing denials and including correct information in the appeal, and including proper billing codes.  Nomi has been unable to obtain full payment on countless claims as a direct result of CHC's failures to perform under the Contracts.

153.    By failing to perform its contractual obligations, CHC has breached at least the following provisions of the Contracts:

a.  Second Solution Order to the MRA, Statement of Work ¶1.1.1(a), (g), by which CHC contractually agreed to "prepare and submit claims" and "follow up on denials and unpaid insurance" as part of its RCM services.

b.  Second Solution Order to the MRA, Statement of Work ¶¶ 1.1; 1.1.1(a), in which CHC agreed to "enter demographic information and coding information into the Billing System" in a "timely and diligent matter."

c. Second Solution Order to the MRA, Appendix C ¶¶ 2(d), (f), by which CHC agreed to perform certain services in connection with its "Coverage Discovery" tool to "submit the appropriate claims to the appropriate third party payors" and "make commercially reasonable efforts to resolve billing issues."

d. Second Solution Order to the MRA, Appendix C ¶ 2(e), in which CHC agreed to provide Nomi with billing information and records, including "the date of the original billing, the date of remit and amounts remitted by the applicable payor, and any other associated detail such as reasons for rejection or reason [a] claim was not submitted."

154.   In addition to these general failures, by failing to take adopt industry standards for the safeguarding of private information—which resulted in the Security Breach and the loss of Nomi's information—and by subsequently failing to notify Nomi of the Security Breach, CHC breached, at minimum, the following provisions of the Contracts:

a. Second Solution Order to the MRA, Statement of Work ¶¶ 1.; 1.1.1(a),(g) which provide that CHC will "prepare and submit claims" on behalf of Nomi and "[f]ollow up on denials and unpaid insurance."

b. Section 8.1 of the MRA (page 4), which provides that "Each party will protect and safeguard the other party's Confidential Information with . . . no less than reasonable care."

c. Section 11 of the MRA (page 5), titled "Professional Services Warranty," by which "CHC warrants that it will perform all Professional Services in a

professional manner consistent with industry standards by trained and skilled
resources."

    d.   Section 14 of the MRA (page 6), titled "Security," by which CHC promised to
"implement industry standard security measures in order to secure the
Products and Services, and [] promptly notify [Nomi] of any unauthorized
access to the Products or Services or any unauthorized use or disclosure of
any Confidential Information or Protected Health Information (a 'Security
Breach')."

    e.   Section 5 of Exhibit 2 to the Solution Order to the MRA (page 24 of the
MRA), in which CHC promised to implement and maintain appropriate
administrative, physical, and technical safeguards to protect against
unauthorized use of Nomi's Transaction information.

    f.   Section 4 of the Processing Services Schedule to the Solution Order to the
MRA(page 15 of the MRA), in which CHC "warrant[ed] that the Processing
Services will perform in material accordance with the functional
specifications in the applicable Documentation."

    g.   Section 7 of Exhibit 2 to the Solution Order to the MRA (pages 24-25 of the
MRA), in which CHC promised to implement industry-standard data
protection measures and notify Nomi of any data breach within 72 hours of
discovering the data breach.

155.    In addition, CHC did not implement industry standard security measures or
exercise reasonable care to protect and safeguard Nomi's confidential information.  Nor did CHC

promptly notify Nomi of the Security Breach; in fact, after discovering the Security Breach on February 21, 2024, CHC **never formally notified Nomi of the breach.**

156.    Instead, Defendants **intentionally misled** Nomi, informing Nomi that the systems were "down," but would be back up shortly, which was untrue.

157.    As described above, Nomi has lost valuable customer and transaction information as result of CHC's breaches of contract, and has been damaged by these breaches in an amount to be determined at trial.

<u>**FOURTH CAUSE OF ACTION**</u>

<u>**(Breach of the Covenant of Good Faith and Fair Dealing against CHC)**</u>

158.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

159.    Nomi and CHC executed several business agreements between 2020 and 2022, known collectively as the Contracts.

160.    A covenant of good faith and fair dealing inheres in every contract in the state of Georgia, including the Contracts between Nomi and CHC.

161.    By engaging in the acts alleged herein, CHC has breached its duty of good faith and fair dealing by, among other things, falsifying records and failing to submit claims, submitting claims to the wrong party, failing to update the security systems to prevent the Security Breach, failing to properly notify Nomi of the Security Breach, and by withholding Nomi's sensitive business data.

162.    Nomi has been damaged by CHC's breach of the covenant of good faith and fair dealing in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Common Law Fraud against All Defendants)

163.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

164.    In Georgia, "[f]raud accompanied by damages to the party defrauded, always gives a right of action to the injury party."  Ga. Code Ann. § 51-6-1.

165.    As detailed above, Defendants made multiple material misrepresentations to Nomi about the skills, experience, capacity, and knowledge to handle Nomi's large volume of claims and protect its data.  Nomi relied on these representations to its detriment.

166.    First, for example, CHC knowingly misrepresented to Nomi that it was a "full RCM service provider" that would be able to timely and diligently process all of Nomi's claims. In a proposal dated December 2, 2020, CHC also misrepresented to Nomi that CHC would provide comprehensive laboratory billing services, monthly reporting, line-item payment posting, and claims follow-up with third-party payors.

167.    Nomi relied on these representations when it contracted with CHC.  Had Nomi known that CHC was not a full RCM service provider and was unable to provide the represented services, it would not have contracted with CHC in the first place, and would not have suffered the millions of dollars in damages described above.

168.    In a meeting with Nomi on January 9, 2025, CHC admitted that it was not, and had never been a full RCM service provider, and that they were instead a "middle" RCM provider—meaning CHC was not and never had been capable of properly processing Nomi's claims from start to finish.

169.    Second, CHC knowingly misrepresented in an email from CHC analyst Daniel Higgins on February 1, 2022 that all claims in an attached spreadsheet—representing $19 million in payments owed to Nomi—had been submitted for payment.

170.    Nomi relied on this misrepresentation believing that the claims had been submitted.  Nomi later learned—in January 2025—that CHC never submitted **tens of thousands** of those claims, costing Nomi millions in unpaid claims.

171.    Third, CHC repeatedly represented that it was processing Nomi's claims, when it knew it was not.  For example, in an email to Nomi on November 14, 2024, CHC represented that it was working on Nomi's claims processing and was "going through Nomi's appeal-based claims."  Nomi relied on these representations.

172.    In January 2025, CHC revealed that it had not worked on any Nomi claims since **February of 2024**.  Nomi not only lost millions in lost claims as a result of this misrepresentation, but it also paid CHC for services it was not providing.

173.    Fourth, as noted above, Defendants repeatedly misrepresented to Nomi that their systems were "down," as opposed to compromised due to a massive data breach.

174.    For example, on February 23, 2024, Defendants informed Nomi that the reason the systems were "down" was due to simple "updates," which would continue through the weekend.  Defendants knew this was false and/or misleading.  Defendants knew they had suffered a system wide ransomware attack as early as February 21, 2024.

175.    Repeatedly, Defendants misrepresented to Nomi that "UHG invests significant resources to maintain Change's data security systems," when in reality Defendants knew those systems were below industry standards.

176.     Fifth, Defendants repeatedly misrepresented that their systems were back online and that Nomi's data was recovered.  As late as February 14, 2025, CHC represented that Nomi had received all the necessary 835 and 837 forms.  Defendants knew this was untrue.  In fact, CHC had lost (or deleted) much of Nomi's data; and many of the HRSA vaccine claims—CHC claimed to have previously submitted—had not been processed.

177.     Nomi has been damaged by its reliance on Defendants' material misrepresentations in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Breach of Fiduciary Duty against All Defendants)

178.     Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

179.     Fiduciary duties and obligations are owed by those in confidential relationships.

180.     Under Georgia law, confidential relationships may be found when one party is justified in reposing confidence in one another—often due to safeguarding confidential or private information on behalf of another.

181.     Nomi was justified in reposing confidence in Defendants based on CHC's representations that it was a full RCM service provider with industry leading expertise in accounting and billing, and that it had taken adequate measures to safeguard Nomi's data privacy.

182.     CHC breached its fiduciary obligations to Nomi in a number of ways, including by failing to properly submit claims to HRSA UIP, failing to adhere to industry guidance and/or standard procedures for the protection of data privacy, and failure to properly follow up with other claims that were submitted (or coded) incorrectly.

183.    Defendants also breached their fiduciary duties by representing that CHC's data security systems were adequate and in-line with industry standards—when in reality they were not—and by subsequently failing to update the security systems to prevent the Security Breach, and then failing to notify Nomi of the Security Breach.

184.    Nomi has been damaged by CHC in an amount to be determined at trial.

## PRAYER FOR RELIEF

A.    That judgment be entered for Plaintiff against Defendants for all general, compensatory, punitive, and liquidated damages in an amount to be proven at trial;

B.    That Plaintiff be awarded all attorneys' fees and costs it has, and will, incur in connection with this action, pursuant to the provisions of the parties' agreements, and/or any applicable law;

C.    That Plaintiff be awarded all available statutory damages, prejudgment and post-judgment interests, as applicable, at the highest lawful rate; and

D.    For equitable relief that Defendants be required to turn over ***all patient data*** regarding claims submitted by Nomi to CHC for submission and refrain from further disclosure of Nomi's confidential information.

E.    For an award of such other relief the Court deems appropriate.

DATED this 21st day of February, 2025.


**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

/s Robin L. McGrath

Robin L. McGrath
GA Bar # 493115
Pranav Lokin
GA Bar # 184838
*Attorneys for Plaintiff Nomi Health, Inc.*
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, GA 30328
robinmcgrath@quinnemanuel.com
pranavlokin@quinnemanuel.com
Telephone: (770) 336-8733
Facsimile: (404) 681-8290
Stephen Q. Wood
(*pro hac vice* admission forthcoming)
Nathan Archibald
(*pro hac vice* admission forthcoming)
*Attorneys for Plaintiff Nomi Health, Inc.*
**QUINN EMANUEL URQUHART & SULLIVAN, LLP**
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
stephenwood@quinnemanuel.com
nathanarchibald@quinnemanuel.com
Telephone: (801) 515-7300
Facsimile: (801) 515-7400

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/25/2025 4:37 PM
TIANA P. GARNER, CLERK

# IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

NOMI HEALTH, INC., a corporation,

      Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC,
a limited-liability company; CHANGE
HEALTHCARE TECHNOLOGY ENABLED
SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED,
a corporation; OPTUM, INC., a corporation; and
OPTUMINSIGHT, INC., a corporation,

      Defendants.

Case No. 25-A-01576-8

Judge Timothy R. Hamil

## MOTION TO APPOINT PROCESS SERVER

Plaintiff files this Motion pursuant to O.C.G.A. § 9-11-4. Plaintiff asks the Court for an

Order authorizing a process server to serve on the Defendants a copy of the attached Summonses

and Complaint. *See* **Exhibit A**. As grounds for this motion, Plaintiff states the following:

1.      It is reasonably believed that service by the Sheriff's Department will be difficult as

they are "understaffed."

2.      Plaintiff has contacted the following process server, Kimberly Greenway, who is an

experienced process server and investigator who may be able to locate and personally serve the

Defendants if authorized to do so by the Court.

3.      The above-named process server is not a party to this action, is not related to

Plaintiff or its attorneys by blood or marriage, and is not Plaintiff's employee.

The above-named process server is a citizen of the United States of America, and is above the age of eighteen.

THEREFORE, Plaintiff respectfully asks for permission to have the above listed person appointed as process server to perfect service of the Summonses and Complaint filed herein upon the Defendants.

Dated: 02/25/25

QUINN EMANUEL URQUHART
& SULLIVAN, LLP

/s Robin L. McGrath
_____
Robin L. McGrath
GA Bar # 493115
Pranav Lokin
GA Bar # 184838
*Attorneys for Plaintiff Nomi Health, Inc.*
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, GA 30328
robinmcgrath@quinnemanuel.com
pranavlokin@quinnemanuel.com
Telephone: (770) 336-8733
Facsimile: (404) 681-8290
Stephen Q. Wood
(*pro hac vice* admission forthcoming)
Nathan Archibald
(*pro hac vice* admission forthcoming)
*Attorneys for Plaintiff Nomi Health, Inc.*
QUINN EMANUEL URQUHART
& SULLIVAN, LLP
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
stephenwood@quinnemanuel.com
nathanarchibald@quinnemanuel.com
Telephone: (801) 515-7300
Facsimile: (801) 515-7400

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

NOMI HEALTH, INC., a corporation,

      Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC,
a limited-liability company; CHANGE
HEALTHCARE TECHNOLOGY ENABLED
SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED,
a corporation; OPTUM, INC., a corporation; and
OPTUMINSIGHT, INC., a corporation,

      Defendants.

Case No. 25-A-01576-8

## ORDER APPOINTING PROCESS SERVER

Plaintiff's Motion for Appointment of Process Server having been read and considered, and it appearing to the Court that sufficient grounds exist for the granting thereof pursuant to O.C.G.A. § 9-11-4(c), it is HEREBY ORDERED that the Plaintiff is authorized to perfect service by the aforementioned process server who is hereby directed to personally serve a copy of the Plaintiff's Summons and Complaint on the Defendant and to make and file proof of service as required by law. The individual appointed is Kimberly Greenway, and is hereby directed to make and file an Affidavit of Service as proof of service as required by law.

This _____ day of _____ 2025.

_____

JUDGE, SUPERIOR COURT
SOUTHERN JUDICIAL CIRCUIT

# EXHIBIT A

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8

2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

SEE ADDENDUM
_____

**Plaintiff**

**v.**

SEE ADDENDUM
_____

**Defendant**

Civil Action No. _____ 25-A-01576-8

## <u>SUMMONS</u>

TO THE ABOVE NAMED DEFENDANT:     **Change Healthcare Technology Enabled Services, LLC**
**Registered Agent: CT Corporation System**

You are hereby required to file with the Clerk of said Court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

Pranav Lokin 1200 Abernathy Road NE Building 600, Suite 1500 Atlanta, GA 30328
pranavlokin@quinnemanuel.com
_____

_____

_____

an answer to the complaint which is hereby served on you. You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This _21st_ day of _February_____, 20 _25_ .

Tiana P. Garner
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed. You must make a notation on this sheet if used.]

SC-1
Rev'd 1/25

# PARTY ADDENDUM

NOMI HEALTH, INC., a corporation,

    Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED, a corporation;
OPTUM, INC., a corporation;
and OPTUMINSIGHT, INC., a corporation,

    Defendants.

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

SEE ADDENDUM

_____

**Plaintiff**

**v.**

SEE ADDENDUM

_____

**Defendant**

Civil Action No. _____ 25-A-01576-8

## <u>SUMMONS</u>

TO THE ABOVE NAMED DEFENDANT:     **Change HealthcareSolutions, LLC**
**Registered Agent: CT Corporation System**

You are hereby required to file with the Clerk of said Court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

_Pranav Lokin 1200 Abernathy Road NE Building 600, Suite 1500 Atlanta, GA 30328_
_pranavlokin@quinnemanuel.com_

_____

_____

an answer to the complaint  which is hereby served on you.  You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

This  _21st_  day of  _February_____ , 20 _25_ .

Tiana P. Garner
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed.  You must make a notation on this sheet if used.]

SC-1
Rev'd 1/25

# PARTY ADDENDUM

NOMI HEALTH, INC., a corporation,

     Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED, a corporation;
OPTUM, INC., a corporation;
and OPTUMINSIGHT, INC., a corporation,

     Defendants.

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8

2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

SEE ADDENDUM
_____

**Plaintiff**

**v.**

SEE ADDENDUM
_____

**Defendant**

Civil Action No. _____ 25-A-01576-8

## SUMMONS

TO THE ABOVE NAMED DEFENDANT:    **Optuminsight, Inc.**
**Registered Agent: CT Corporation System**

     You are hereby required to file with the Clerk of said Court and serve upon the plaintiff or plaintiff's attorney, whose name, address and email address are:

Pranav Lokin 1200 Abernathy Road NE Building 600, Suite 1500 Atlanta, GA 30328
pranavlokin@quinnemanuel.com

_____

_____

an answer to the complaint  which is hereby served on you.  You must make your answer within 30 days after service of this summons upon you. This time excludes the day of service. If you fail to answer, the court will issue a default judgment against you for the relief sought in the complaint.

     If this action pertains to a Protective Order, the answer is to be filed and served on or before the scheduled hearing date attached.

     This  21st  day of  February                    , 20 25 .

Tiana P. Garner
Clerk of Superior Court

By _____
Deputy Clerk

[Attach addendum sheet for additional parties, if needed.  You must make a notation on this sheet if used.]

# PARTY ADDENDUM

NOMI HEALTH, INC., a corporation,

     Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED, a corporation;
OPTUM, INC., a corporation;
and OPTUMINSIGHT, INC., a corporation,

     Defendants.

E-FILED IN OFFICE - RE
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/21/2025 5:08 PM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

|  |  |
|---|---|
| NOMI HEALTH, INC., a corporation, <br><br> Plaintiff, <br><br> vs. <br><br> CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company; CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability company; UNITEDHEALTH GROUP INCORPORATED, a corporation; OPTUM, INC., a corporation; and OPTUMINSIGHT, INC., a corporation, <br><br> Defendants. | Case No.  25-A-01576-8 <br><br> **Jury Trial Demanded** |

## COMPLAINT

Plaintiff Nomi Health, Inc. ("Nomi") states as follows for its Complaint against

Defendants Change Healthcare Solutions, LLC and Change Healthcare Technology Enabled

Services, LLC (together, "CHC"), UnitedHealth Group Incorporated ("UHG"), Optum, Inc., and

OptumInsight, Inc., (together, "Optum") (collectively, "Defendants").

## INTRODUCTION

1.      Nomi is a healthcare entity that provides direct patient care.  After growing

rapidly during the COVID-19 pandemic, Nomi engaged CHC to manage its claims processing

and ensure proper reimbursement for its services.  Since UHG-subsidiary Optum acquired CHC

in 2022, Optum and UHG have controlled, operated, and acted for and on behalf of CHC with

respect to the matters at issue herein.

2.      Nomi has paid CHC over $35 million to date, yet CHC has failed to live up to its

representations, consistently failing to perform its basic duties under the parties' agreement, such

as accurately processing claims and following up on denied claims.  In addition, CHC repeatedly

lied and misled Nomi to hide its failures, referring Nomi to Optum and UHG and claiming they

were responsible for resolving Nomi's claims processing issues.

3.     To add insult to injury, in the midst of these failures, Defendants failed to comply

with their duty to employ proper data security measures to protect Nomi confidential

information, resulting in a cataclysmic data breach and the complete loss of Nomi's sensitive

commercial health data.

4.     Defendants <u>failed to provide Nomi with proper notice</u> of the data breach.  Instead,

Defendants misled Nomi, claiming their systems and servers were momentarily down for

"updates," due to a cybersecurity event, when in fact they had suffered a system wide ransom

attack resulting in the loss of Nomi's and other customers sensitive data.

5.     Defendants have violated their statutory, fiduciary, and contractual obligations to

Nomi and others through reckless or intentional misconduct.  Nomi brings this action to

vindicate its rights under Georgia law.

## PARTIES, JURISDICTION AND VENUE

6.     Plaintiff Nomi Health, Inc. is a Delaware corporation with its principal place of

business in Utah.

7.     Defendant Change Healthcare Solutions, LLC is a Delaware LLC with its

principal place of business in Nashville.

8.     Defendant Change Healthcare Technology Enabled Services, LLC is a Georgia

LLC with its principal place of business in Minnesota.

9.     Defendant UnitedHealth Group is a Delaware corporation with its principal place

of business in Minnetonka, Minnesota.  UHG exercises control over CHC's cybersecurity and IT

systems, including the systems impacted by the events described herein that housed the personal, medical, and financial information, including electronic protected health data of Georgia residents and entities.

10.     Defendant Optum, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum regularly transacts business in Georgia through its operation of CHC, and transmits personal, medical, and financial information, including electronic protected health data through its operation of the CHC.

11.     Defendant OptumInsight, Inc. is a Delaware corporation with its principal place of business in Eden Prairie, Minnesota.  Optum regularly transacts business in Georgia through its operation of CHC, and transmits personal, medical, and financial information, including electronic protected health data through its operation of the CHC.

12.     This Court has personal jurisdiction over Defendants because they are registered to do business in Georgia with registered agents in the State.  Additionally, Change Healthcare Technology Enabled Services, LLC is a Georgia entity controlled by Defendants.  Defendants also executed contracts with Nomi that include a choice of law provision for the State of Georgia.  Personal jurisdiction is also proper because each Defendant regularly transacts business in the state and contracts to supply services in the state.  In addition, upon information and belief, many of Defendants' computers, networks, and data located in the State of Georgia were the subject of the unpermitted behavior at issue in this Complaint.

13.     Venue is proper in this Court pursuant to O.C.G.A. § 9-10-30 and other applicable law, as certain contracts at issue were—upon information and belief—executed in Gwinnett County, Georgia, and Defendants conduct business within Gwinnett County, Georgia.

Additionally, many of the acts and omissions giving rise to Plaintiff's claims occurred within Gwinnett County, Georgia.

14.    This is an action for damages in excess of Fifteen Thousand Dollars ($15,000) exclusive of attorneys' fees and costs.

## FACTUAL ALLEGATIONS

**A.    Background**

***Nomi's Founding and Growth During the COVID-19 Pandemic***

15.    Nomi is a direct-to-patient healthcare company founded in 2019.  The company's lineal contracting model streamlines healthcare services by eliminating middlemen to reduce costs.

16.    Nomi grew quickly during the COVID-19 pandemic as a premiere provider of testing and vaccinations.  It worked closely with governments, businesses, and other healthcare providers to deploy mobile testing sites and facilitate access to vaccinations, including to prisons, long-term care facilities, border sites, shelters, and government housing facilities.

***CHC Agrees to Timely and Diligently Perform Revenue Cycle Management Services***

17.    As Nomi rapidly grew, it recognized the need for a revenue cycle management ("RCM") services industry leader as a partner to help it grow and develop.  RCM service refers to the financial aspects of patient care—including the processing of insurance claims, which was (and remains) vital to Nomi's business.

18.    Nomi began searching for and vetting RCM services providers. During this competitive search process, Nomi requested proposals from leading industry RCM services providers, including CHC.

4

19.     Nomi informed CHC at the outset of the parties' relationship that the volume of claims would be intensive due to Nomi's rapid growth and the extensive services it provided.  In its proposals to be Nomi's provider, CHC represented itself as "best in class" for RCM services, and indicated that it could adequately meet Nomi's growing needs.  It also claimed to be a "full RCM vendor."  In a proposal dated December 2, 2020, CHC also represented to Nomi that CHC would provide comprehensive laboratory billing services, monthly reporting, line-item payment posting, and claims follow-up with third-party payors.

20.     In reliance on CHC's representations, Nomi entered into a business relationship with Defendants in December 2020.  Due to the sensitive nature of Nomi's customer data, Nomi relied heavily on CHC's asserted expertise.

21.     Nomi signed a Master Relationship Agreement ("**MRA**") with CHC on December 1, 2020.  This agreement (and its subsequent amendments) set forth the parties' working relationship, with a foundation of CHC's minimum obligations to provide RCM services for Nomi.

22.     In addition to the MRA, CHC and Nomi executed a series of supplemental agreements. These include: a Solution Order to the MRA, dated December 1, 2020; a Second Solution Order to the MRA, dated January 8, 2021; a First Amendment to the MRA and Solution Order, dated March 24, 2022; and a Second Amendment to the Solution Order, dated May 16, 2022 (collectively, the "**Contracts**").

23.     At the time Nomi and CHC entered into this business relationship, the parties mutually understood that CHC would not simply be augmenting the capabilities or staff of Nomi's RCM function.  Rather, CHC agreed to serve as the fully-outsourced RCM services provider for Nomi.

24.    It was not until more than four years later that Nomi learned, by Defendants' admissions during a January 9, 2025 meeting, that CHC was *not* a full-service RCM vendor but was instead a "middle" RCM vendor, meaning that it was not and never had been equipped to process Nomi's claims as it had previously represented.

25.    Under the Contracts, CHC agreed to "prepare and submit claims" and "follow up on denials and unpaid insurance" as part of its RCM services.  Second Solution Order to the MRA, Statement of Work ¶1.1.1(a), (g).

26.    CHC agreed to "enter demographic information and coding information into the Billing System" in a "timely and diligent matter"; "submit the appropriate claims to the appropriate third party payors"; and "make commercially reasonable efforts to resolve billing issues."  *Id.*, Statement of Work ¶¶ 1.1; 1.1.1(a); Appendix C ¶¶ 2(d), (f).

27.    CHC also agreed to provide Nomi with billing information and records, including "the date of the original billing, the date of remit and amounts remitted by the applicable payor, and any other associated detail such as reasons for rejection or reason [a] claim was not submitted."  *Id.*, Appendix C ¶ 2(e).

28.    To facilitate provision of these services, Nomi entrusted Defendants with extensive confidential information, including its patients' highly sensitive personal information. In this sense, Defendants functioned as the custodians of *all* Nomi's claims data.

***Defendants Process and Store Sensitive Personal Information***

29.    Defendants act together as a digital clearinghouse for the healthcare industry, providing revenue and payment cycle management services that connect patients, providers, pharmacies, and payors within the healthcare pipeline.  The information Defendants receive, process, and store for Nomi is subject to the requirements of the Health Insurance Portability and

Accountability Act of 1996, Pub. L. No. 104-191, 110 Stat. 1936, as amended by the Health

Information Technology for Economic and Clinical Health Act Pub. L. No. 111-5, 123 Stat. 226

("HIPAA"). These laws generally require the implementation of security procedures and

practices that "[e]nsure the confidentiality, integrity, and availability of all electronic protected

health information the covered entity or business associate creates, receives, maintains, or

transmits." HIPAA, 45 CFR § 164.306(a).

30.     As one of the largest processors of sensitive health information in the nation,

CHC, its parent entity UHG, and its operating entity Optum recognized and acknowledged the

importance of proper data handling and up-to-date security systems.

31.     In the course of its business, Defendants receive, process, and store electronic

protected health information of tens of millions of Americans.

32.     Defendants represented that they had numerous security policies in place that

should have prevented the harms at issue here, purportedly including Multi-Factor

Authentication, information control and backup infrastructure for all network zones, and a

recovery testing process.

**B.      Defendants Breach Their Contractual, Fiduciary, and Statutory Obligations**

33.     Despite its contractual and statutory obligations, CHC repeatedly failed to

perform even the most basic functions, including by failing to: (1) submit claims to the proper

payors; (2) enter the proper coding information; (3) follow-up on denials and under-

reimbursements; and (4) provide accurate records to Nomi.

34.     Furthermore, CHC falsely represented on *multiple* occasions that these errors had

been resolved.

35.    These misrepresentations and failures were uncovered by Nomi through its own costly and time-consuming independent efforts to obtain payment for claims that CHC failed to process properly.

***CHC's Failures and Misrepresentations to Process Claims***

36.    In the aggregate, CHC has failed to correctly process over 3.6 million claims. In some instances, CHC failed to prepare and submit claims altogether, even though it represented to Nomi that such claims had been processed.

37.    For example, on February 1, 2022, a CHC data analyst represented to Nomi via email that all claims in an attached spreadsheet (representing $19 million in payments owed to Nomi) had been properly submitted to the payor for payment.

38.    Nomi relied on that representation and made strategic business decisions under the assumption that those claims had been submitted, and that it would be paid for those claims.

39.    However, in an email dated February 10, 2025, CHC's data analyst for Nomi's account admitted that this statement was false and misleading because CHC had improperly submitted and never subsequently corrected nor resubmitted *tens of thousands* of these claims.

40.    Nomi learned—during a January 9, 2025 meeting with Defendants' representatives—that CHC has not worked *any* of Nomi's claims since roughly February of 2024. This revelation came as a shock to Nomi, given that CHC had represented to Nomi as recently as November 2024 that it was actively processing Nomi's claims. In an email dated November 14, 2024, a CHC account manager—employed by Optum—provided to Nomi a chart identifying the pending claims in Nomi's 30, 60, and 210-day accounts receivables, and represented that CHC/Optum was still actively working on those claims. This representation was

false, as CHC/Optum had not worked Nomi's claims for at least nine months at the time of its November 2024 representation.

41.    Where CHC *has* submitted claims, those claims have been rife with errors. For example:

a.    Numerous claims were sent to the wrong payor, *i.e.*, claims which should have been sent to payors like Multiplan, Zelus, or HRG were instead erroneously sent to FirstHealth—which is not a payor at all—for payment. This error was repeated across **hundreds of thousands of claims** sent to dozens of incorrect payors.

b.    CHC posted direct patient payments for claims which, as a matter of law, Nomi was not permitted to accept payment. CHC's errors resulted in Nomi having to return thousands of dollars of payments to patients after Nomi independently discovered the issue via news stories disparaging Nomi for CHC's error.

c.    CHC improperly coded claims, often so egregiously that payors refused to accept claims from Nomi at all. For instance, a Hawaii-based payor notified Nomi that—because the claims it was receiving from CHC on Nomi's behalf were so severely miscoded it could not even discern what the claims were for—the payor would not accept *any* further claims from Nomi until it could provide *thirty* examples of correctly coded claims.

d.    CHC committed a coding error that resulted in all codes which should have contained the sequence "000" or "555" converting to contain the sequence "NNN."

9

e.  CHC failed and in some cases outright refused to follow up on more than half a million previously denied claims, making no credible efforts to pursue these denials or engage with the payors to determine the basis for the rejections.

f.  In cases where CHC *did* appeal denied claims, the appeal letters were grossly deficient, containing factually incorrect or irrelevant data, omitting the proper billing codes for payors to identify the subject of the appeal, and failing to identify the letter's purpose.

***CHC's Failures and Misrepresentations in Connection with HRSA UIP***

42.  During the COVID-19 pandemic, the Health Resources and Services Administration established the Uninsured Program ("HRSA UIP") to process and distribute reimbursement to healthcare providers who provided testing, treatment, and vaccine administration to uninsured patients.

43.  CHC also contracted to process Nomi's HRSA UIP claims, but failed to do so.

44.  For example, CHC failed to properly code claims for COVID-19 testing.  Coding these claims is simple, but requires two entries: one for specimen collection, which is billed at $40, and one for lab testing, which is billed at $140.

45.  However, when billing the HRSA UIP for these claims, CHC failed to include the lab code.  This omission resulted in a $140 error ***on each and every HRSA UIP testing claim***.

46.  Repeated over the course of Nomi's 151,808 HRSA UIP claims, this resulted in a loss of over $20 million that should have been paid by HRSA UIP to Nomi.

47.  CHC also failed to properly code claims for COVID-19 vaccinations.  Like COVID-19 testing claims, these claims require two codes: one for the vaccine (which cannot be

billed for payment), and one for the vaccine administration, which entitles the claimant to payment.

48.     The standard industry practice is to bill the vaccine at one cent (which was disregarded by the payer) and bill the administration of the vaccine at the HRSA approved rate of $40.

49.     Instead, CHC improperly billed roughly ***75,000 vaccine administrations at one cent***, omitting the administration code necessary for Nomi to receive payment.  This failure alone resulted in millions of dollars of lost revenue for Nomi.

50.     These failures were exacerbated by CHC's failure to maintain its promised pace with Nomi's patient care.  CHC consistently failed to timely process Nomi's daily HRSA file submissions and accumulated a backlog of several hundred thousand unprocessed HRSA UIP claims.

51.     Nomi repeatedly raised this issue to CHC.  Rather than fix the problem, however, CHC misrepresented the facts to Nomi—assuring Nomi that it had put systems in place to remedy the issue, when in reality it had not.

52.     In a recent January 9, 2025 meeting, Michael Summers from CHC and Optum finally came clean: CHC had *not* fixed the backlog; rather, they "thought they sent them all," but "files were stored in several locations because of new shells" or "HRSA claims were saved online."  In other words, almost three years after the HRSA program closed, CHC and Optum finally admitted that they had never remedied the backlog issue, resulting in thousands of unsubmitted HRSA claims.

53.     CHC failed to resolve any of these issues by the time the HRSA UIP program closed in March 2022.  Nomi was subsequently unable to independently pursue payment for these claims because of CHC's gross negligence and misrepresentations to Nomi.

***CHC's Misrepresentations and Failures Put Nomi's Medicaid Licensure in Jeopardy***

54.     CHC's numerous failures nearly cost Nomi its Medicaid licensure, creating costly complications in Florida.

55.     One RCM service CHC agreed to provide was a healthcare "lockbox"—a service that centralizes digital payments and documents.  Nomi paid CHC to regularly monitor the lockbox and notify Nomi of any information requests that had been submitted.

56.     Nomi relied on CHC to monitor the lockbox, but CHC failed to do so.  As a result, Nomi received what is commonly referred to as the "final notice to terminate," which was sent to ***every*** provider in the state of Florida—informing them of lockbox mismanagement.  This caused nearly all Florida payors to refuse payment, each one citing the final notice to terminate as a basis for doing so.

57.     The final notice to terminate not only cost Nomi financially, it placed Nomi's Medicaid licensure in jeopardy and drastically delayed reimbursement of a net $46,744,338 in claims by Florida State Medicaid.

58.     CHC's misrepresentations related to its lockbox monitoring also caused significant cash flow issues for Nomi, including three lawsuits due to Nomi's inability to pay invoices, a $2,500 fine, an increase in capital costs, and dilution of Nomi Health.  Ultimately, Nomi had to raise approximately $10 million just to maintain operations after the final notice to terminate.

59.    When Nomi inquired about CHC's failure to maintain the lockbox, it was informed that the employee who had been assigned to monitor the lockbox—and indeed the only one given access—had not been employed by Optum **for months**.

60.    Had Defendants properly monitored the lockbox as CHC agreed to, Nomi never would have received the final notice to terminate, nor suffered damages in Florida.

***Defendants Conceal Their Errors by Failing to Provide Nomi with Records***

61.    Based on Defendants' failures, Nomi began requesting access to its own data so that it could begin the costly and time-consuming process of processing the claims itself.  In particular, Nomi sought the electronic files used to inform healthcare providers about an insurance provider's response to a claim (known as "835" and "837" forms).

62.    CHC was obligated to provide Nomi with accurate billing and payment records, including 835 and 837 forms, yet routinely failed to perform this simple task.

63.    Instead, when Nomi requested copies of the 837 forms—so that it could maintain an internal backup on its own server or seek alternate vendors to process the claims—Defendants represented that they could only provide "about 90%" of the records.  When Nomi requested copies of the 835 forms, CHC sent only about 50% of what was requested.

64.    Through its own labor-intensive efforts to reconcile claims that should have been processed by CHC, Nomi discovered that several **million** 835 and 837 forms remain missing.

65.    This was contrary to previous representations made by CHC—and relied upon by Nomi—which asserted that the issue had been resolved.

66.    At one point, CHC indicated that 8.6 million individual medical record numbers had "paid" or "denied" events, but CHC only provided Nomi with 4.67 million corresponding 835 forms.

67.     When confronted with this discrepancy, CHC informed Nomi that it had *intentionally* deleted some of these forms due to system or file corruption.

68.     Nomi identified an additional 59,000 instances where the 835 forms did not align with CHC's own data.  Specifically, while CHC data shows no response from the payor, the corresponding 835 forms demonstrate that the claims were denied.  Upon information and belief, CHC intentionally misrepresented which claims related to which 835 forms because they knew they had failed to properly maintain the data.

69.     These errors are a direct result of Defendants' gross failures, wanton misconduct, and fraudulent claims processing.

**C.     The Data Breach**

70.     In addition to CHC's inexcusable failures to provide routine and basic RCM services, Defendants are also directly responsible for a catastrophic data breach in February 2024 which has caused immeasurable damages to Nomi.

71.     Prior to the breach, Defendants claimed that they had numerous enterprise information security policies in place to prevent security breaches, including multi-factor authentication on all user authenticated systems, among other alleged safeguards.

72.     Defendants' public representations also illustrated that they recognized and acknowledged the importance of proper data handling and up-to-date security systems.

73.     For example, CHC included in its Code of Conduct, publicly available on its website at the time of the Security Breach, the following representations:

   a. "We exercise care and discretion when handling [restricted and confidential] information."

b. "We collect, store, access, use, share, transfer, and dispose of [personally identifiable information] responsibly."

c. "We also respect and protect the sensitive nature of [protected health information] and carefully maintain its confidentiality."

d. "We earn the trust of our team members and the companies with which we do business by following our privacy, security, and data and information protection policies."

e. "We also regularly monitor our systems to be sure that information is accessed and used for appropriate, authorized activities, to discover any new threats, and to look for ways to improve."

f. "We monitor and control all electronic and computing devices used … to interact with our internal networks and systems."

74. CHC's Global Privacy Notice, publicly available on its website at the time of the Security Breach, advertised:

a. "CHC Healthcare functions as a HIPAA business associate for its HIPAA covered entity payor and provider customers at its primary business function, so CHC Healthcare's collection, use and disclosure of protected health information is guided by HIPAA and the terms of a business associate agreement and other contracts."

b. "We implement and maintain organizational, technical, and administrative security measures designed to safeguard the data we process against unauthorized access, destruction, loss, alteration, or misuse."

75.    In February 2023, CHC published a "Regulatory and Standards Update" and boasted: "To demonstrate our continued commitment to assure that applicable Change Healthcare products and services meet industry and regulatory requirements and expectations, we maintain several industry-recognized and trusted accreditations and certifications." *Change Healthcare Regulatory and Standards Update*, 59 (Feb. 15, 2023), https://health.maryland.gov/pophealth/Documents/Change_Healthcare_Regulatory_and_Standards_Quarterly_Update.pdf.

76.    Defendants confirmed their data security competence on multiple occasions throughout the parties' relationship.

77.    For example, on or about June 23, 2024, CHC moved to a platform called "Move-It," which Nomi believed had certain security vulnerabilities, so Nomi asked Defendants if its data would be affected.  In response, Nomi was told that "**UHG** invests significant resources to maintain CHC's data security systems."  This led Nomi to believe that its data would be secure.

***Defendants Owed Contractual, Statutory, and Fiduciary Duties to Protect Nomi's Data***

78.    In addition to Defendants' general policies and representations regarding data security, CHC—in particular—was bound by express contractual obligations to protect Nomi's data.

79.    For example, Section 8.1 of the MRA provides: "Each party will protect and safeguard the other party's Confidential Information with . . . no less than reasonable care."

80.    Section 11 of the MRA, titled "Professional Services Warranty," provides that "CHC warrants that it will perform all Professional Services in a professional manner consistent with industry standards by trained and skilled resources."

81.     Section 14 of the MRA, titled "Security," obligates CHC to "implement industry standard security measures in order to secure the Products and Services, and [] promptly notify [Nomi] of any unauthorized access to the Products or Services or any unauthorized use or disclosure of any Confidential Information or Protected Health Information (a 'Security Breach')."

82.     Section 5 of Exhibit 2 to the MRA, titled "Security Measures," provides that "CHC will implement and maintain appropriate administrative, physical, and technical safeguards, including encryption, for protection of the security, confidentiality and integrity of all Transaction information, including to prevent unauthorized use or disclosure of, or access to, Transaction information by third parties, and CHC will only store and process Transaction information as required to fulfill its obligations under this MRA and/or as required by applicable laws. CHC is responsible for, and the term 'Security Breach' as used in this MRA will include, any unauthorized use or disclosure of any Transaction information."

83.     Section 4 of the Processing Services Schedule to the Solution Order to the MRA provides that CHC "warrants that the Processing Services will perform in material accordance with the functional specifications in the applicable Documentation."

84.     Section 7 of Exhibit 2 to the Solution Order to the MRA, titled "IT Security and Privacy," provides that CHC will, among other things, maintain proper certifications, maintain HIPAA compliance, rotate master client keys at least annually, encrypt all data in flight and at rest; and notify Nomi of any data breaches regarding data it shared with CHC within 72 hours of determination of a breach.

85.     On various instances when Nomi has questioned CHC about its contractual obligations, CHC has consistently referred Nomi to Optum.  CHC is a subsidiary of Optum, and

the contact information for "questions or complaints" related to CHC's Global Privacy Notice is an Optum email and an Optum mailing address. Optum, in turn, is owned by UHG.

86.    As a repository to Nomi's sensitive data, Defendants owed fiduciary duties to safeguard Nomi's private information related to sensitive healthcare data.

87.    As set forth below, Defendants failed to comply with those fiduciary obligations, in addition to the contractual provisions cited above. In particular, Defendants did not implement industry standard security measures. Nor did they properly notify Nomi of the breach.

***Hackers Access CHC's Systems and Exfiltrate Sensitive Data***

88.    Although Defendants never properly notified Nomi about facts related to the breach, Nomi has since learned details about what took place from public disclosures in other lawsuits related to the data breach.

89.    According to these disclosures, on or about February 11, 2024, the username and password for a low-level, customer support employee's access to CHC's Citrix portal (the "Portal") were posted in an Telegram group chat that advertises the sale of stolen credentials.

90.    The Portal was a virtual desktop, where the employee could access the CHC applications (as permitted by CHC) needed to perform their job responsibilities. The account was a basic, user-level account: it only had access to specific applications and did not have administrator access or credentials.

91.    On February 12, 2024, a hacker accessed the Portal via the username and password shared on the Telegram group chat, thus gaining entry to the basic, user-level account. From that limited account, the hacker was able to break into the server that hosted CHC's medication management application, SelectRX.

92.    This access to systems critical to CHC's operations—by a user-level account—went undetected by Defendants until the hacker revealed itself, after it began to encrypt CHC's systems over a week later, locking CHC out of those systems.

93.    From there, the hacker created privileged accounts with administrator capabilities that permitted access to and deletion of any and all files, changes to system configurations, and similar administrator-level activities.  These actions went to the heart of the integrity of CHC's most critical IT infrastructure, but still went undetected by Defendants.

94.    Over the next nine days, the hacker navigated through CHC's systems and servers at will, installing multiple malware tools and applications, as well as a number of "backdoors" that would allow the hacker to return to those environments in the event CHC did detect the suspicious activity and try to block access.

95.    The hacker continued to access the systems undetected and unimpeded.  The hacker copied and exfiltrated terabytes of personal identifying information, financial account information, and protected health information for tens of millions of individuals, including Social Security numbers, driver's licenses, state ID numbers, passport numbers, health insurance information (such as primary, secondary or other health plans/policies, insurance companies, member/group ID numbers, and Medicaid-Medicare-government payor ID numbers), health information (such as medical record numbers, providers, diagnoses, medicines, test results, images, care and treatment), and/or billing, claims and payment information (such as claim numbers, account numbers, billing codes, payment cards, financial and banking information, payments made, and balance due).  These acts, too, went undetected until the hacker revealed itself.

***Nomi Finally Learns of the Attack***

96.    It was not until February 21, 2024, when the hacker deployed ransomware on CHC's systems causing outages and disruptions, that Defendants purportedly became aware of a cybersecurity threat to CHC's systems.

97.    That day, in response, Defendants took CHC's systems offline.  That is, the hacker's infiltration of CHC's systems was so severe that CHC's only response was to shut down its primary *and* secondary systems.

98.    Defendants misled Nomi about the nature of the breach.  Instead of admitting that their systems had been hacked, Defendants told Nomi that their systems were down for maintenance, but that they would be back up shortly.

99.    On or about February 23, 2024, Defendants again misled Nomi, stating that the *reason* the systems were being shut down was for "updates" that would continue through the weekend.  Defendants knew this was untrue.

100.    On or about February 26, 2024, the ransomware group BlackCat/ALPHV ("BlackCat") claimed responsibility for the attack.  CHC later confirmed that BlackCat had represented itself as responsible for the attack, and had claimed to have stolen terabytes of data.

101.    On or about March 3, 2024, UHG made a bitcoin ransom payment to BlackCat of approximately $22 million.

102.    The payment of the ransom, however, did not bring CHC's systems back online or mitigate the harm done.  Because CHC was unable to check every system and interface for backdoors, and because CHC's backup systems were also compromised, CHC was unable to repair its systems.  Instead, CHC opted to rebuild its systems from the ground up because its redundancy systems were inadequate.

103.    The data breach—and resulting harm—were avoidable had Defendants implemented proper security measures.  As of February of 2024, CHC did not have systems, policies, and practices in place appropriate to secure and protect the volume and highly sensitive nature of the data being handled, including Nomi's data.

104.    Upon information and belief, Defendants were aware that CHC maintained outdated and highly-vulnerable systems.  For instance, as UHG's CEO testified to Congress, aspects of CHC's legacy systems used to process claims and payments were *up to 40 years old*. UHG's CEO also revealed that CHC stored most of its data on physical servers, rather than cloud-based servers, which were less secure and lacked appropriate segmentation to take into account the sensitivity of the data at issue.

105.    Among the outdated features of CHC's systems was the lack of multi-factor authentication, a security feature that requires a user to provide multiple, independent pieces of evidence to authenticate their identify and gain access to a system.

106.    Once CHC's system was infiltrated, the hacker was able to disable both the primary and backup systems because the backup systems were not isolated from the primary, and few elements were stored on the cloud, both basic security features.  Moreover, CHC's redundancies were also affected, inadequate, or both.  This prevented the backup and redundancy systems from being effectively utilized to mitigate the damage from the breach.

107.    Similarly, the lack of segmented systems, which are common to cloud-based servers, allowed the hacker to travel among CHC's systems freely—compromising multiple systems which CHC was unable to recover—and ultimately resulting in the complete shutdown of CHC's operations.

108.    These failures demonstrate Defendants' breach of its obligations to "safeguard [Nomi] Confidential Information with . . . no less than reasonable care" and "implement industry standard security measures in order to secure the Products and Services."

109.    The Security Breach also caused Nomi severe reputational harm among payors and providers.  At least one provider informed Nomi that, because of the lack of data, it would not accept any more Nomi claims until it could consistently present more accurate information.

***Failure to Provide Notice***

110.    CHC was under a contractual obligation to "promptly notify [Nomi] of any unauthorized access to the Products and Services" including "any data breaches regarding data shared with [CHC] by Nomi within 72 hours of determination of a bona fide Security Breach." MRA ¶ 14; Ex. 2 ¶ 7.

111.    CHC did not promptly notify Nomi of the Security Breach; in fact, after discovering the Security Breach on February 21, 2024, Defendants ***misled*** Nomi, informing them that the systems were "down," but would be back up shortly, which was untrue.

112.    Nomi eventually learned the truth—that the systems were not, in fact, "down due to updates," but that a hack had occurred and that their data was missing and/or unrecoverable.

113.    Ultimately, the hack was catastrophic for Nomi, compounding already existing problems by causing additional delay in processing—and adding harm to providers, payors, and consumers.

114.    Nomi was unable to access important data like 835 and 837 forms, and Optum continuously represented that the servers were down.  This prevented Nomi from being able to discern what it was owed from payors, and directly impacted its ability to engage in or complete bulk settlements with providers like Advent, Brighthealth, Cigna, and Oscar.

22

115.    For example, in the midst of Nomi's efforts to settle claims with certain payors that had been mishandled by CHC, Nomi lost a large volume of claim numbers, which prevented further efforts to settle the claims.

116.    For the claims they *were* able to settle, Nomi was often forced to accept a lower offer due to the data breach.  By way of example, prior to the breach, one provider owed Nomi approximately $2 million, but because of the lack of data available after the breach, Nomi was forced to settle for $***35,000***.

117.    Without the available data, Nomi did not know how much it was owed, and was forced to rely on the *payor* to provide that information.

118.    Bulk negotiations with payors were also drawn out because Nomi ***didn't have access to the systems***.

119.    Another problem caused by the breach was that Nomi was required to hire <u>other vendors</u> to do work that CHC was neglecting (or refusing) to complete.  On average, Nomi spent an estimated $75,000 to $100,000 per month on these new vendors to do the same work that it was ***already paying CHC to do***.

120.    Throughout 2024 and the beginning of 2025, CHC continued to misrepresent to Nomi that the claims it had agreed to handle would be processed.  As noted above, Nomi discovered—in January of 2025—that CHC had stopped working on these claims in ***February of 2024***.  Many of the claims—such as Hawaii Medicaid claims—have since timed out and can no longer be processed.

121.    Had Nomi known that CHC was ***not*** working those claims, it could have sought to process those claims through one of its alternate vendors.

122.    Nomi has repeatedly asked Defendants to correct these errors—both in writing and orally.

123.    Beginning in February 2024, Nomi held a weekly meeting with Optum to work through these complications and seek alternative remedies to their losses.  On various occasions, Nomi asked CHC/Optum to correct certain inconsistencies or inaccuracies, but CHC/Optum never did.  Defendants never even ***attempted*** to integrate Nomi's lost data back into its system.

124.    Instead of addressing the actual issue, Optum suggested that Nomi enroll in the company's temporary funding program while the systems were "down."  Nomi was informed that their concerns should be routed through UHG's lobbyists.  Nomi contacted UHG and Optum's deputy counsel, who rebuffed Nomi's concerns.

## FIRST CAUSE OF ACTION

### (Violation of § 10-1-372 of the Unfair Trade Practices Act against All Defendants)

125.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

126.    A person engages in a deceptive trade practice under the Unfair Trade Practices Act ("UTPA") when he represents that "services are of a particular standard, quality, or grade . . . if they are of another."

127.    Corporations damaged by a deceptive trade practice may be granted an injunction or other equitable relief against the party charged with the unlawful practice in addition to attorneys' fees if the offending party "willfully engaged in the trade practice knowing it to be deceptive."

128.    Defendants engaged in multiple deceptive trade practices as detailed above by willfully misrepresenting the quality of their services and cybersecurity protocols, by claiming

that they had properly submitted claims on Nomi's behalf, and by misleading Nomi about gravity of the data breach.

129.    When Nomi raised concerns about these misrepresentations, CHC referred Nomi to both Optum and UHG employees to purportedly resolve claims processing errors and the loss of Nomi data.  Despite numerous good faith attempts by Nomi to work with Defendants, Defendants have failed to correct the processing errors and recover Nomi's lost data. Defendants' misrepresentations have resulted in millions of dollars in damages to Nomi.

130.    For example, despite touting itself as an expert in billing and coding the procedures of healthcare providers to thousands of payors, CHC failed to adhere to even the most basic aspects of Nomi's billing to the HRSA UIP—namely, the use of Modifier 90 for laboratory procedures performed by a reference lab.

131.    This is a basic feature of lab billing; yet, Nomi discovered thousands of examples in which CHC provided HCFA 1500/CMS 1500 forms showing Modifier 90 claims for two different labs.

132.    Similarly, CHC only submitted to the HRSA UIP for one charge (the lesser of the two—the specimen collection), and omitted the remainder of what should have been a much larger claim.

133.    Nomi has repeatedly raised theses failure with the Defendants who were unable to correct the coding procedures and UIP specimen charges, costing Nomi millions of dollars in lost claims.

134.    Defendants also failed to properly safeguard Nomi's confidential consumer data, allowing their systems to be breached and permitting access to hundreds of thousands of Nomi client records.  To date, Defendants have not recovered Nomi's data.

135.    For example, Defendants have not been able to produce the 835s and 837s forms—that should be in their possession—back to Nomi so that Nomi could submit its own claims after the data breach.

136.    This has not only caused delays to Nomi's business operations, but it has prevented Nomi from collecting on numerous payor claims and/or seeking another vendor to process outstanding claims, and has further opened the company up to liability for the loss of confidential consumer data.

137.    Based on these failures, Nomi is entitled to equitable relief requiring Defendants to turn over *all records* related any claims filed (or sent to CHC to be filed) on behalf of Nomi, in addition to all attorneys' fees with regard to bringing this Complaint.

138.    Relief under the UTPA is not limited to equitable relief; additional remedies are available "under the common law or other statutes of the state" as identified below.

## SECOND CAUSE OF ACTION

## (Violation of § 10-1-393 of the Fair Business Practices Act of 1975 against All Defendants)

139.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

140.    The purpose of the Fair Business Practices Act ("FBPA") is to protect consumers and legitimate business enterprises from unfair or deceptive practices in the conduct of trade or commerce.

141.    Under the FBPA, it is unlawful to "represent[] that goods or services have . . . characteristics [] uses, [or] benefits . . . that they do not have" or "represent[] that goods or services are of a particular standard, quality, or grade . . . if they are of another." FBPA § 10-1-393(a); (b)(5); (b)(7).  The FBPA protects both businesses as consumers and individuals as consumers. *See Inkaholiks Luxury Tattoos Georgia, LLC v Parton*, 751 S.E.2d 561, 563  (Ga.

Ct. App. 2013) ("The FBPA protects businesses from unfair or deceptive practices in the conduct of trade or commerce . . . and provides for damages and injunctive relief.")

142.    It is also unlawful under the FBPA for "any person . . . who is engaged in any activity involving or using a computer or computer network . . . [to] [e]mploy any device, scheme, or artifice, to defraud a person, organization, or entity" or "[e]ngage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon a person, organization or entity."  FBPA § 10-1-393.5(b).

143.    Any person (or corporation) who suffers an injury or damages as a result of a violation of the FBPA has a remedy against the offending party pursuant to Ga. Code Ann. § 10-1-399.

144.    Defendants engaged in multiple deceptive trade practices as detailed above by willfully misrepresenting the quality of their services and cybersecurity protocols, by holding themselves out as a comprehensive RCM provider, by claiming that they had properly submitted claims on Nomi's behalf, and by misleading Nomi about gravity of the data breach.

145.    Nomi has sent multiple written notices advising Defendants of their material failures and contractual breaches.  On March 1, 2023, Nomi gave CHC notice of its failure to properly process claims. Nomi re-iterated these same concerns by letter on November 6, 2023. As noted above, in response to these and other good faith attempts to resolve issues, CHC consistently referred Nomi to Optum and UHG representatives.

146.    Most recently, on April 24, 2024, after numerous emails and meetings with Defendants' representatives attempting to recover Nomi's data after the data breach, Nomi sent a letter to Defendants' counsel, identifying the claims processing failures, inconsistent and missing data, and the losses Nomi had suffered.

147.    To date, Defendants have not recovered Nomi data, corrected the missing and inconsistent claims processing, or paid Nomi for the losses it has suffered due to their misrepresentations and deceptive business practices.

148.    Nomi has been damaged by an amount to be determined at trial.

**THIRD CAUSE OF ACTION**

**(Breach of Contract against CHC)**

149.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

150.    As explained above, Nomi and CHC executed several business agreements between 2020 and 2022, known collectively as the Contracts.

151.    Nomi has complied with all material terms of the Contracts.

152.    CHC repeatedly failed to perform under the Contracts, including billing the proper payor, appealing denials and including correct information in the appeal, and including proper billing codes.  Nomi has been unable to obtain full payment on countless claims as a direct result of CHC's failures to perform under the Contracts.

153.    By failing to perform its contractual obligations, CHC has breached at least the following provisions of the Contracts:

   a.  Second Solution Order to the MRA, Statement of Work ¶1.1.1(a), (g), by which CHC contractually agreed to "prepare and submit claims" and "follow up on denials and unpaid insurance" as part of its RCM services.

   b.  Second Solution Order to the MRA, Statement of Work ¶¶ 1.1; 1.1.1(a), in which CHC agreed to "enter demographic information and coding information into the Billing System" in a "timely and diligent matter."

    c.   Second Solution Order to the MRA, Appendix C ¶¶ 2(d), (f), by which CHC agreed to perform certain services in connection with its "Coverage Discovery" tool to "submit the appropriate claims to the appropriate third party payors" and "make commercially reasonable efforts to resolve billing issues."

    d.   Second Solution Order to the MRA, Appendix C ¶ 2(e), in which CHC agreed to provide Nomi with billing information and records, including "the date of the original billing, the date of remit and amounts remitted by the applicable payor, and any other associated detail such as reasons for rejection or reason [a] claim was not submitted."

154.    In addition to these general failures, by failing to take adopt industry standards for the safeguarding of private information—which resulted in the Security Breach and the loss of Nomi's information—and by subsequently failing to notify Nomi of the Security Breach, CHC breached, at minimum, the following provisions of the Contracts:

    a.   Second Solution Order to the MRA, Statement of Work ¶¶ 1.; 1.1.1(a),(g) which provide that CHC will "prepare and submit claims" on behalf of Nomi and "[f]ollow up on denials and unpaid insurance."

    b.   Section 8.1 of the MRA (page 4), which provides that "Each party will protect and safeguard the other party's Confidential Information with . . . no less than reasonable care."

    c.   Section 11 of the MRA (page 5), titled "Professional Services Warranty," by which "CHC warrants that it will perform all Professional Services in a

professional manner consistent with industry standards by trained and skilled resources."

d. Section 14 of the MRA (page 6), titled "Security," by which CHC promised to "implement industry standard security measures in order to secure the Products and Services, and [] promptly notify [Nomi] of any unauthorized access to the Products or Services or any unauthorized use or disclosure of any Confidential Information or Protected Health Information (a 'Security Breach')."

e. Section 5 of Exhibit 2 to the Solution Order to the MRA (page 24 of the MRA), in which CHC promised to implement and maintain appropriate administrative, physical, and technical safeguards to protect against unauthorized use of Nomi's Transaction information.

f. Section 4 of the Processing Services Schedule to the Solution Order to the MRA(page 15 of the MRA), in which CHC "warrant[ed] that the Processing Services will perform in material accordance with the functional specifications in the applicable Documentation."

g. Section 7 of Exhibit 2 to the Solution Order to the MRA (pages 24-25 of the MRA), in which CHC promised to implement industry-standard data protection measures and notify Nomi of any data breach within 72 hours of discovering the data breach.

155.    In addition, CHC did not implement industry standard security measures or exercise reasonable care to protect and safeguard Nomi's confidential information.  Nor did CHC

promptly notify Nomi of the Security Breach; in fact, after discovering the Security Breach on February 21, 2024, CHC **never formally notified Nomi of the breach.**

156.    Instead, Defendants **intentionally misled**  Nomi, informing Nomi that the systems were "down," but would be back up shortly, which was untrue.

157.    As described above, Nomi has lost valuable customer and transaction information as result of CHC's breaches of contract, and has been damaged by these breaches in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Breach of the Covenant of Good Faith and Fair Dealing against CHC)

158.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

159.    Nomi and CHC executed several business agreements between 2020 and 2022, known collectively as the Contracts.

160.    A covenant of good faith and fair dealing inheres in every contract in the state of Georgia, including the Contracts between Nomi and CHC.

161.    By engaging in the acts alleged herein, CHC has breached its duty of good faith and fair dealing by, among other things, falsifying records and failing to submit claims, submitting claims to the wrong party, failing to update the security systems to prevent the Security Breach, failing to properly notify Nomi of the Security Breach, and by withholding Nomi's sensitive business data.

162.    Nomi has been damaged by CHC's breach of the covenant of good faith and fair dealing in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Common Law Fraud against All Defendants)

163.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

164.    In Georgia, "[f]raud accompanied by damages to the party defrauded, always gives a right of action to the injury party."  Ga. Code Ann. § 51-6-1.

165.    As detailed above, Defendants made multiple material misrepresentations to Nomi about the skills, experience, capacity, and knowledge to handle Nomi's large volume of claims and protect its data.  Nomi relied on these representations to its detriment.

166.    First, for example, CHC knowingly misrepresented to Nomi that it was a "full RCM service provider" that would be able to timely and diligently process all of Nomi's claims. In a proposal dated December 2, 2020, CHC also misrepresented to Nomi that CHC would provide comprehensive laboratory billing services, monthly reporting, line-item payment posting, and claims follow-up with third-party payors.

167.    Nomi relied on these representations when it contracted with CHC.  Had Nomi known that CHC was not a full RCM service provider and was unable to provide the represented services, it would not have contracted with CHC in the first place, and would not have suffered the millions of dollars in damages described above.

168.    In a meeting with Nomi on January 9, 2025, CHC admitted that it was not, and had never been a full RCM service provider, and that they were instead a "middle" RCM provider—meaning CHC was not and never had been capable of properly processing Nomi's claims from start to finish.

169.    Second, CHC knowingly misrepresented in an email from CHC analyst Daniel Higgins on February 1, 2022 that all claims in an attached spreadsheet—representing $19 million in payments owed to Nomi—had been submitted for payment.

170.    Nomi relied on this misrepresentation believing that the claims had been submitted.  Nomi later learned—in January 2025—that CHC never submitted ***tens of thousands*** of those claims, costing Nomi millions in unpaid claims.

171.    Third, CHC repeatedly represented that it was processing Nomi's claims, when it knew it was not.  For example, in an email to Nomi on November 14, 2024, CHC represented that it was working on Nomi's claims processing and was "going through Nomi's appeal-based claims."  Nomi relied on these representations.

172.    In January 2025, CHC revealed that it had not worked on any Nomi claims since ***February of 2024***.  Nomi not only lost millions in lost claims as a result of this misrepresentation, but it also paid CHC for services it was not providing.

173.    Fourth, as noted above, Defendants repeatedly misrepresented to Nomi that their systems were "down," as opposed to compromised due to a massive data breach.

174.    For example, on February 23, 2024, Defendants informed Nomi that the reason the systems were "down" was due to simple "updates," which would continue through the weekend.  Defendants knew this was false and/or misleading.  Defendants knew they had suffered a system wide ransomware attack as early as February 21, 2024.

175.    Repeatedly, Defendants misrepresented to Nomi that "UHG invests significant resources to maintain Change's data security systems," when in reality Defendants knew those systems were below industry standards.

176.    Fifth, Defendants repeatedly misrepresented that their systems were back online and that Nomi's data was recovered.  As late as February 14, 2025, CHC represented that Nomi had received all the necessary 835 and 837 forms.  Defendants knew this was untrue.  In fact, CHC had lost (or deleted) much of Nomi's data; and many of the HRSA vaccine claims—CHC claimed to have previously submitted—had not been processed.

177.    Nomi has been damaged by its reliance on Defendants' material misrepresentations in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Breach of Fiduciary Duty against All Defendants)

178.    Plaintiff Nomi Health hereby realleges and incorporates all previous allegations.

179.    Fiduciary duties and obligations are owed by those in confidential relationships.

180.    Under Georgia law, confidential relationships may be found when one party is justified in reposing confidence in one another—often due to safeguarding confidential or private information on behalf of another.

181.    Nomi was justified in reposing confidence in Defendants based on CHC's representations that it was a full RCM service provider with industry leading expertise in accounting and billing, and that it had taken adequate measures to safeguard Nomi's data privacy.

182.    CHC breached its fiduciary obligations to Nomi in a number of ways, including by failing to properly submit claims to HRSA UIP, failing to adhere to industry guidance and/or standard procedures for the protection of data privacy, and failure to properly follow up with other claims that were submitted (or coded) incorrectly.

183.    Defendants also breached their fiduciary duties by representing that CHC's data security systems were adequate and in-line with industry standards—when in reality they were not—and by subsequently failing to update the security systems to prevent the Security Breach, and then failing to notify Nomi of the Security Breach.

184.    Nomi has been damaged by CHC in an amount to be determined at trial.

## PRAYER FOR RELIEF

A.    That judgment be entered for Plaintiff against Defendants for all general, compensatory, punitive, and liquidated damages in an amount to be proven at trial;

B.    That Plaintiff be awarded all attorneys' fees and costs it has, and will, incur in connection with this action, pursuant to the provisions of the parties' agreements, and/or any applicable law;

C.    That Plaintiff be awarded all available statutory damages, prejudgment and post-judgment interests, as applicable, at the highest lawful rate; and

D.    For equitable relief that Defendants be required to turn over ***all patient data*** regarding claims submitted by Nomi to CHC for submission and refrain from further disclosure of Nomi's confidential information.

E.    For an award of such other relief the Court deems appropriate.

DATED this 21st day of February, 2025.


**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**

/s Robin L. McGrath
Robin L. McGrath
GA Bar # 493115
Pranav Lokin
GA Bar # 184838
*Attorneys for Plaintiff Nomi Health, Inc.*
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, GA 30328
robinmcgrath@quinnemanuel.com
pranavlokin@quinnemanuel.com
Telephone: (770) 336-8733
Facsimile: (404) 681-8290
Stephen Q. Wood
(*pro hac vice* admission forthcoming)
Nathan Archibald
(*pro hac vice* admission forthcoming)
*Attorneys for Plaintiff Nomi Health, Inc.*
**QUINN EMANUEL URQUHART
& SULLIVAN, LLP**
2755 E. Cottonwood Parkway, Suite 430
Salt Lake City, Utah 84121
stephenwood@quinnemanuel.com
nathanarchibald@quinnemanuel.com
Telephone: (801) 515-7300
Facsimile: (801) 515-7400

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/26/2025 10:53 AM
TIANA P. GARNER, CLERK

# IN THE SUPERIOR COURT OF GWINNETT

## STATE OF GEORGIA

| |
|---|
| Nomi Health, Inc., |
| |
| Plaintiff(s) |
| |
| vs. |
| |
| Change Healthcare Solutions, LLC, et al., |
| |
| Defendant(s). |

Civil Action No. 25-A-01576-8
The Honorable Timothy R. Hamil

## VERIFIED APPLICATION FOR *PRO HAC VICE* ADMISSION

Pursuant to Georgia Uniform Superior Court Rule 4.4, I, Mr. Stephen Q. Wood  (Applicant), hereby applies to this Honorable Court for admission to practice in the above-styled case *pro hac vice*. In support of this application, Applicant states as follows:

1.  I reside at:

    3345 E. Hidden Oak Drive
    Cottonwood Heights, UT 84121

2.  My business address is:
    Quinn Emanuel Urquhart & Sullivan, LLP
    2755 E. Cottonwood Parkway, Suite 430
    Salt Lake City, UT 84121
    Phone: 801-515-7300
    Fax: 801-515-7400
    stephenwood@quinnemanuel.com

3.  I have been retained to represent the following client(s)/plaintiff(s):

    Nomi Health, Inc.
    898 N. 1200 W.
    Suite 200
    Orem, UT 84057

4.    I am a member in good standing of the following jurisdictions:
Court and/or Jurisdiction: Utah
Contact information: Utah Supreme Court (801) 578-3900
Date admitted: 5/15/2020
Current Status:  Active
Bar/Registration No.: 12403
Jurisdiction: California
Date admitted: 12/25/2005
Still admitted: Yes
Current Status:  ActiveBar/Registration No.: 241363

5.    I have never been a member of the State Bar of Georgia.

6.    I have never been denied *pro hac vice* admission in Georgia.

7.    I have never had *pro hac vice* admission revoked in Georgia.

8.    I have never been sanctioned or formally disciplined by a court in Georgia.

9.    I have never been the subject of any formal disciplinary proceedings.

10.    I have never been formally held in contempt, or otherwise sanctioned by a court in a written order, for disobedience to its rules or orders.

11.    In the past two years I have not filed for *pro hac vice* admission in Georgia.

12.    I have reviewed and am familiar with the Georgia Rules of Professional Conduct and all court rules relevant to practice before the court in which I am seeking admission.

13.    My local sponsor is:
Robin L. McGrath
Bar Number: 493115
Quinn Emanuel Urquhart & Sullivan, LLP
1200 Abernathy Road NE
Building 600, Suite 1500
Atlanta, GA 30328
770-336-8733

14.    When I file my application I will forward a copy to the State Bar of Georgia along with a check or money order made payable to the State Bar of Georgia in the amount of $275, as I have not submitted the annual fee for this calendar year.

I, Stephen Q. Wood, applicant in the foregoing Verified Application for *Pro Hac Vice* Admission, hereby verify the facts contained therein are true and accurate to the best of my knowledge.

This _____25th_____ day of ___February___, 20 _25_

_____
**Applicant**

Sworn to before me this ___25th___ day of ___February___, 20 _25_

_____
**Notary Public**

LISA HEWITSON
Notary Public, State of Utah
Commission # 717484
My Commission Expires
May 5, 2025

My commission expires ___5-5-2025___

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served the Office of the General Counsel with a true and complete copy of the foregoing Verified Application for Pro Hac Vice Admission via their online portal on their website, www.gabar.org, and electronically served a copy of the same on the below-identified counsel:

I hereby certify that I have this date served the Office of the General Counsel with a true and complete copy of the foregoing Verified Application for Pro Hac Vice Admission by U.S. Mail with adequate postage thereon to:

Office of the General Counsel
State Bar of Georgia
104 Marietta Street, NW
Suite 100
Atlanta, GA 30303
Attn: Pro Hac Vice

I am initiating this litigation and do not know who opposing counsel(s) is at this time. I will serve copy of the foregoing Verified Application for Pro Hac Vice Admission on opposing counsel as soon as possible and will notify the Office of the General Counsel of the same.

Filed on this _____26_____ of ____February____, ____2025____

_____
Robin L. McGrath
493115

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/26/2025 10:14 AM
TIANA P. GARNER, CLERK

## IN THE SUPERIOR COURT OF GWINNETT COUNTY
## STATE OF GEORGIA

NOMI HEALTH, INC., a corporation,

     Plaintiff,

vs.

CHANGE HEALTHCARE SOLUTIONS, LLC,
a limited-liability company; CHANGE
HEALTHCARE TECHNOLOGY ENABLED
SERVICES, LLC, a limited-liability company;
UNITEDHEALTH GROUP INCORPORATED,
a corporation; OPTUM, INC., a corporation; and
OPTUMINSIGHT, INC., a corporation,

     Defendants.

Case No. 25-A-01576-8

### ORDER APPOINTING PROCESS SERVER

Plaintiff's Motion for Appointment of Process Server having been read and considered,

and it appearing to the Court that sufficient grounds exist for the granting thereof pursuant to

O.C.G.A. § 9-11-4(c), it is HEREBY ORDERED that the Plaintiff is authorized to perfect

service by the aforementioned process server who is hereby directed to personally serve a copy

of the Plaintiff's Summons and Complaint on the Defendant and to make and file proof of

service as required by law. The individual appointed is Kimberly Greenway, and is hereby

directed to make and file an Affidavit of Service as proof of service as required by law.

This 26th day of _____February_____ 2025.

_____

JUDGE, SUPERIOR COURT
SOUTHERN JUDICIAL CIRCUIT

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
25-A-01576-8
2/27/2025 4:54 PM
TIANA P. GARNER, CLERK

AFFIDAVIT OF SERVICE

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

NOMI HEALTH, INC., a corporation,

                    Plaintiff,

                                                Civil Action No: 25-A-01576-8

v.

CHANGE HEALTHCARE SOLUTIONS, LLC,
a limited-liability company,

                    Defendants,

_____

STATE OF DELAWARE              }
                               }ss.
COUNTY OF NEW CASTLE           }

I, Lisa Joyner, of Parcels Inc., the State of Delaware, County of New Castle, being duly sworn, say that on the 25th day of February, 2025 at 11:45 a.m., I personally served a copy of a Summons and Complaint with supporting documents on **Optum, Inc.,** by serving the registered agent, The Corporation Trust Company at 1209 Orange Street, Wilmington, DE 19801.

Name of individual accepting service: Robin Hutt-Banks – Authorized to accept
Description of individual: African-American female, 55-60 yrs. old, 175 lbs., 5'7" with black hair.

_____
Lisa Joyner

Subscribed and sworn before me
This 25th day of February, 2025

_____
Notary Public

My commission expires: _____

ZAHID HOSSAIN NAWAZ
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires August 25, 2026

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8

2/27/2025 4:54 PM
TIANA P. GARNER, CLERK

AFFIDAVIT OF SERVICE

IN THE SUPERIOR COURT OF GWINNETT COUNTY
STATE OF GEORGIA

NOMI HEALTH, INC., a corporation,

                    Plaintiff,

                                        Civil Action No: 25-A-01576-8

v.

CHANGE HEALTHCARE SOLUTIONS, LLC,
a limited-liability company,

                    Defendants,

STATE OF DELAWARE              }
                              }ss.
COUNTY OF NEW CASTLE           }

I, Lisa Joyner, of Parcels Inc., the State of Delaware, County of New Castle, being duly sworn, say that on the 25th day of February, 2025 at 11:45 a.m., I personally served a copy of a Summons and Complaint with supporting documents on **UnitedHealthGroup Incorporated,** by serving the registered agent, The Corporation Trust Company at 1209 Orange Street, Wilmington, DE 19801.

Name of individual accepting service: Robin Hutt-Banks – Authorized to accept
Description of individual: African-American female, 55-60 yrs. old, 175 lbs., 5'7" with black hair.

                                        _____
                                                Lisa Joyner

Subscribed and sworn before me
This 25th day of February, 2025

_____
Notary Public

My commission expires: _____

ZAHID HOSSAIN NAWAZ
NOTARY PUBLIC
STATE OF DELAWARE
My Commission Expires August 25, 2026

FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
**25-A-01576-8**
**2/27/2025 4:54 PM**
TIANA P. GARNER, CLERK

## AFFIDAVIT OF SERVICE

State of Georgia                         County of Gwinnett                         Superior Court

Case Number: 25-A-01576-8

Plaintiff:
**NOMI HEALTH, INC., a corporation**

vs.

Defendant:
**CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company; CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a limited-liability company; UNITEDHEALTH GROUP INCORPORATED, a corporation; OPTUM, INC., a corporation; and OPTUMINSIGHT, INC., a corporation,**

Received by Kimberly Greenway Services, Inc. on the 26th day of February, 2025 at 11:37 am to be served on **Optuminsight, Inc. c/o Registered Agent: CT Corporation System, 289 S Culver Street, Lawrenceville, GA 30046.**

I, Kimberly Greenway, being duly sworn, depose and say that on the **26th day of February, 2025** at **2:07 pm, I:**

served the Garnishee, **Optuminsight, Inc. c/o Registered Agent: CT Corporation System** by personally serving **Jane Richardson,** title **Intake specialist,** as a person authorized to accept garnishments, located at **289 S Culver Street, Lawrenceville, GA 30046** with the following: **SUMMONS; COMPLAINT; ORDER APPOINTING PROCESS SERVER;**

**Description** of Person Served: Age: 67, Sex: F, Race/Skin Color: Caucasian, Height: 5'9", Weight: 195, Hair: Dark Blonde, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action.

Subscribed and Sworn to before me on the 26th day of February, 2025 by the affiant who is personally known to me

NOTARY PUBLIC

**Kimberly Greenway**
GCPS #206

**Kimberly Greenway Services, Inc.**
**505 Lakeland Plaza**
**Suite 308**
**Cumming, GA 30040**
**(404) 487-6085**

Our Job Serial Number: KGS-2025011705
Ref: 2025.02.21

*(Notary seal: RICHARD BENITO, NOTARY, EXPIRES 09-14-2025, GEORGIA, PUBLIC, DAWSON COUNTY)*

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA
**25-A-01576-8**
**2/27/2025 4:54 PM**
TIANA P. GARNER, CLERK

## AFFIDAVIT OF SERVICE

State of Georgia                 County of Gwinnett                 Superior Court

Case Number: 25-A-01576-8

Plaintiff:
**NOMI HEALTH, INC., a corporation**

vs.

Defendant:
**CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a
limited-liability company; UNITEDHEALTH GROUP INCORPORATED, a
corporation; OPTUM, INC., a corporation; and OPTUMINSIGHT, INC., a
corporation,**

Received by Kimberly Greenway Services, Inc. on the 26th day of February, 2025 at 11:37 am to be served on
**Change HealthcareSolutions, LLC c/o Registered Agent: CT Corporation System, 289 S Culver Street,
Lawrenceville, GA 30046**.

I, Kimberly Greenway, being duly sworn, depose and say that on the **26th day of February, 2025** at **2:07 pm, I:**

served **Change HealthcareSolutions, LLC c/o Registered Agent: CT Corporation System** by personally
serving **Jane Richardson, Intake specialist** located at 289 S Culver Street, Lawrenceville, GA 30046 with:
**SUMMONS; COMPLAINT; ORDER APPOINTING PROCESS SERVER;**.

**Description** of Person Served: Age: 67, Sex: F, Race/Skin Color: Caucasian, Height: 5'9", Weight: 195, Hair: Dark
Blonde, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action.

Subscribed and Sworn to before me on the 26th day
of February, 2025 by the affiant who is personally
known to me.

NOTARY PUBLIC

**Kimberly Greenway**
GCPS #206

**Kimberly Greenway Services, Inc.
505 Lakeland Plaza
Suite 308
Cumming, GA 30040
(404) 487-6085**

Our Job Serial Number: KGS-2025011703
Ref: 2025.02.21

RICHARD BENITO
NOTARY
EXPIRES
GEORGIA
09-14-2025
PUBLIC
DAWSON COUNTY

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

**25-A-01576-8**

**2/27/2025 4:54 PM**
TIANA P. GARNER, CLERK

## AFFIDAVIT OF SERVICE

State of Georgia                    County of Gwinnett                    Superior Court

Case Number: 25-A-01576-8

Plaintiff:
**NOMI HEALTH, INC., a corporation**

vs.

Defendant:
**CHANGE HEALTHCARE SOLUTIONS, LLC, a limited-liability company;
CHANGE HEALTHCARE TECHNOLOGY ENABLED SERVICES, LLC, a
limited-liability company; UNITEDHEALTH GROUP INCORPORATED, a
corporation; OPTUM, INC., a corporation; and OPTUMINSIGHT, INC., a
corporation,**

Received by Kimberly Greenway Services, Inc. on the 26th day of February, 2025 at 11:37 am to be served on
**Change Healthcare Technology Enabled Services, LLC c/o Registered Agent: CT Corporation System, 289 S
Culver Street, Lawrenceville, GA 30046.**

I, Kimberly Greenway, being duly sworn, depose and say that on the **26th day of February, 2025** at 2:07 pm, I:

served **Change Healthcare Technology Enabled Services, LLC c/o Registered Agent: CT Corporation
System** by personally serving **Jane Richardson, Intake specialist** located at **289 S Culver Street,
Lawrenceville, GA 30046** with: SUMMONS; COMPLAINT; ORDER APPOINTING PROCESS SERVER;.

**Description** of Person Served: Age: 67, Sex: F, Race/Skin Color: Caucasian, Height: 5'9", Weight: 195, Hair: Dark
Blonde, Glasses: Y

I certify that I am over the age of 18, have no interest in the above action.

Subscribed and Sworn to before me on the 26th day
of February, 2025 by the affiant who is personally
known to me.

NOTARY PUBLIC

RICHARD BENITO
NOTARY
EXPIRES
GEORGIA
09-14-2025
PUBLIC
DAWSON COUNTY

Kimberly Greenway
GCPS #206

**Kimberly Greenway Services, Inc.
505 Lakeland Plaza
Suite 308
Cumming, GA 30040
(404) 487-6085**

Our Job Serial Number: KGS-2025011704
Ref: 2025.02.21

Copyright © 1992-2025 DreamBuilt Software, Inc. - Process Server's Toolbox V9.0a

E-FILED IN OFFICE - CS
CLERK OF SUPERIOR COURT
GWINNETT COUNTY, GEORGIA

25-A-01576-8

3/11/2025 3:45 PM
TIANA P. GARNER, CLERK



## State Bar of Georgia

Office of the General Counsel

**RUSSELL D. WILLARD**
*General Counsel*

**LORI ANDERSON**
**MERCEDES G. BALL**
**LEIGH BURGESS**
**WILLIAM V. HEARNBURG, JR.**
**JAMES S. LEWIS**
**ANDREEA N. MORRISON**
**ADRIENNE D. NASH**
**WILLIAM D. NESMITH, III**
**JOHN J. SHIPTENKO**

February 28, 2025

The Honorable R. Timothy Hamil
Superior Court of Gwinnett County
Gwinnett Justice & Adminstration Center
75 Langley Drive
Lawrenceville, GA 30046

Re: Application for Admission *Pro Hac Vice* of Mr. Stephen Q. Wood, <u>Nomi Health, Inc.</u>
<u>v. Change Healthcare Solutions, LLC., et al.</u>, Superior Court of Gwinnett County, Civil Action
File No. 25-A-01576-8

Dear Judge Hamil:

Mr. Stephen Q. Wood filed an application for admission *pro hac vice* with the Superior
Court of Gwinnett County in the above-referenced case. Pursuant to Rule 4.4 of the Uniform
Superior Court Rules, Mr. Wood served the Office of the General Counsel of the State Bar of
Georgia with a fee payment and a copy of the application. Based upon my review, Mr. Wood has
paid the required fees and it appears as though the application complies with Rule 4.4 and
Appendix A of Rule 4.4.

Yours truly,

John J. Shiptenko
Senior Assistant General Counsel

Enclosure

JJS/nd
c:
Stephen Wood
Robin McGrath



# ***Pro Hac Vice*** **Information for Applicants and Sponsors**

1. The Office of the General Counsel (OGC) is not a party to your case and, as such, the applicant or sponsor must serve a copy of the enclosed letter on all counsel if:

   - The underlying case was e-filed;
   - You did not provide the OGC with opposing counsel contact information, or
   - You did not provide the OGC with a certificate of service.

2. Please notify the OGC via email at phvannualfee@gabar.org (include applicant's full name, caption of the case, and case number) if/when:

   - The case is closed.
   - The sponsor changes.
   - There is a change to the applicant's contact information.
   - There is a change to the sponsor's contact information.
   - There is a change to the judge assigned to the case.
   - The *pro hac vice* admission is denied or revoked by a Court order.
   - The applicant withdraws from the case.
   - The Court does not rule on the *pro hac vice* application.

3. In accordance with Court rules, if the Court grants the applicant admission *pro hac vice*, the applicant must pay an annual fee of $200 on or before January 15th for each subsequent calendar year of admission.

   - The annual fee is per attorney, not per case.
   - If the annual fee is not received by January 15th, Georgia Rule of Professional Conduct 5.5(l) requires the applicant to submit a late fee of $100, along with the annual fee, both of which the applicant must pay no later than March 1st.
   - If the applicant does not submit the required fee(s) by the appropriate deadline, the OGC will notify the Court.
   - It is the applicant's responsibility to notify this office of any changes to the status of your admission (see section 2. above), otherwise we will assume the case is still pending and the annual fee is due.
   - If the applicant is still admitted (attorney of record with the Court) in the case (regardless of the status of the case) on January 15th, the applicant is **required** to submit the annual fee.

Feel free to contact the OGC at phvannualfee@gabar.org with any questions.